GENERAL ELECTRIC COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ann Holycross, Appellee).

Fourth District (Industrial Commission Division)   No. 4—88—0326WC

Opinion filed June 21, 1989.—Modified on denial of rehearing December 5, 1989.

McCULLOUGH, J., dissenting.

John F. Martin, of Dukes, Martin, Helm & Ryan, Ltd., of Danville, for appellant.

David C. Harrison, of Scheele, Cornelius & Associates, Ltd., of La-Grange, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Ann Holycross, filed two applications for benefit, both on the same day. The first application alleged an accident occurring on February 6, 1985, resulting in injury to her right shoulder, arm,

and wrist. The second application alleged an accident occurring on June 25, 1985, resulting again in injury to her right shoulder. The cases were consolidated at arbitration.

Claimant testified at the April 14, 1986, arbitration hearing as follows. On February 6, 1985, claimant had been employed by General Electric for 26 years. At that time, she was a "combination worker," attaching electrical leads and soldering wires onto a ballast. The ballasts weighed about two pounds each, and she would pull down three to five of these ballasts at a time. She stood while performing this job.

As claimant worked with each ballast, she would pull leads down from above and insert them with her right hand. Each lead was inserted into a hold, and the claimant would pound it down. She could then pull the lead out through the hole with her right hand and solder the connection, holding the soldering gun with her right hand. Next, she would push 6 to 12 of these ballasts down the roller belt with her right hand.

Claimant would then go to the other end of the belt and insert leads. She would have to put bundles of leads in a bin. She would lift bundles of these leads with both hands. The bins were at about head level. She would then take ballasts and put them on the roller belt.

The claimant would next pull leads out of the bins and insert several leads into each end of the ballasts. As she finished about five ballasts, she would shove them down the roller belt to other employees and start all over again. She performed these functions all day long, rotating usually from attaching leads to the stringing job.

In the latter part of 1984, while working, claimant began to note pain in her right shoulder, forearm, and hand. She went to the company nurse, who wrapped the arm in an ace bandage and gave her a pain pill. After that, the claimant saw the company nurse about once a week for the same treatment. Claimant did inform her foreman about her problem.

In January 1985, claimant was experiencing breathing problems, and General Electric sent her to Dr. Lopez, who admitted her to St. Elizabeth's Hospital for breathing tests. While she was in the hospital, Dr. Lopez called in Dr. Johnson, an orthopedic doctor, who evaluated her. Dr. Johnson had Dr. Tazudeen, a neurologist, perform an EMG on claimant.

After her release from the hospital, claimant saw Dr. Johnson once a month. The doctor treated her with injections of cortisone and placed a splint on her right forearm which she wore except at work. After three or four months of treatment with Dr. Johnson, claimant

seemed to be getting better. Claimant had continued to work during this time.

On June 25, 1985, claimant was performing a different job with ballasts than her regular one. She would push 10-pound ballasts down to the test set, testing them and pushing them on down to the packing station and packing. She worked this particular job for a couple of hours every day.

On June 25, 1985, claimant was getting ready to test the ballasts which were double stacked behind the test set. She went around the test set and shoved about 20 ballasts down to her test set, pushing with her right arm. She felt a sharp pain in her right shoulder which went up into her neck. Claimant went to the nurse, who gave her a pain pill, and she returned to work.

At the beginning of July 1985, claimant took one week's vacation. She returned to work and worked one week, and then took two more weeks' vacation. She then returned to work. She noted that while she was off work, she was not bothered by pain in her shoulder, but as soon as she used pressure, the pain returned.

On August 6, 1985, claimant again saw Dr. Johnson. He continued to give her inflammatory pills, an injection, and had claimant stay home from work. He also prescribed physical therapy two to three times a week and did an arthrogram in September 1985. In November 1985, Dr. Johnson operated on claimant's right shoulder. Following surgery, he prescribed mild therapy two or three times a week. Claimant has not worked since August 6, 1985.

At the time of the hearing, claimant still suffered pain in her right shoulder and right arm. Weather changes produce more pain and aching. Dr. Johnson, whom she continued to see once a month, restricted her lifting to two pounds. When she lifts, she has a lot of pulling and hurting, especially when her right arm is extended. She had not injured her right shoulder prior to February 1985 and not since June 25, 1985.

On cross-examination, claimant testified that she had been treated for bursitis and impingement in 1984. On August 22, 1985, she completed a form applying for group disability benefits, and she stated that the facts set forth in that document were accurate at the time she filled out the form.

On redirect examination, claimant was asked if she knew what the definition of an accident was under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*). Over the objection of General Electric, claimant testified that she did not. General Electric then introduced a copy of the group disability benefit form which

claimant had filled out and which she indicated that her disability was not the result of an accident.

The evidence deposition of Dr. Leighton Johnson, an orthopedic specialist, was admitted into evidence at the request of the claimant. Dr. Johnson testified that he first saw claimant on February 2, 1985, at the request of Dr. Lopez, her internist. He took a history from her and performed a physical examination. After reviewing the results of the EMG performed by Dr. Tazudeen and the X rays, Dr. Johnson's impression was that the claimant was suffering from mild right carpal tunnel syndrome, mild right lateral epicondylitis (tennis elbow), chronic cervical strain, and mild impingement syndrome of the right shoulder. His recommendation was to monitor the condition, and that she be kept on anti-inflammatory medicine. At the present time, the claimant is showing signs of improvement. She can lift up to about 2 to 2½ pounds in her present range of motion, which is still limited. She is still not ready to be released to return to steady work. It would be a minimum of two months before she could return to work full time.

Dr. Johnson testified that the number one cause of carpal tunnel syndrome is idiopathic, to wit, it just occurs in a patient. He generally sees it in people who use their hands in a repetitive manner on a daily basis. Epicondylitis is associated with forearm and wrist movements, usually repetitive, against resistance. The impingement syndrome can be due to degeneration in the muscle by aging. Many times it is caused by repetitive motion. However, there are a wide variety of causes for it. The chronic cervical strain apparently was no longer a problem for claimant.

In Dr. Johnson's opinion, the repetitive motion of claimant's work was an aggravating factor of the carpal tunnel syndrome. While claimant's "tennis elbow" was not bothering her too much, the carpal tunnel syndrome and tennis elbow are aggravated by the same type of activity, so it was possible that claimant's work aggravated this condition as well. The tennis elbow is temporary. The carpal tunnel syndrome is in a dormant state. It could very well have a release at some time, so that it would not be permanent in the long run.

On cross-examination, Dr. Johnson testified that cardiovascular problems are not generally factors that cause carpal tunnel syndrome unless the patient were suffering congestive heart failure, which would cause fluid to be retained throughout the body. The doctor stated that claimant was in an age bracket where some patients have degeneration of their musculature of the shoulder. While the tennis elbow was a temporary condition, the further development of the im-

pingement syndrome depends on claimant's future progress. When Dr. Tazudeen did another EMG on June 1, 1985, Dr. Tazudeen interpreted the results as showing no evidence of carpal tunnel syndrome.

Dr. Johnson did not know what had caused claimant's right shoulder problem. The condition could be caused by overhead use of the shoulder. According to the doctor, the amount of weight was not important, but rather the use of the shoulder in an overhead fashion. Another causal activity would be forward flexion. The problem could be caused by a single traumatic event or by repetitive stress. Everyday use could also cause an eventual tear.

Dr. Johnson testified that a bone scan was performed on claimant by Dr. Shah. The result of that showed a "slightly increased uptake" in both shoulders and the right wrist. According to Dr. Johnson, the significance of this was that it was "probably mild arthritic or degenerative changes."

Dr. Johnson did not know what caused the rotator cuff tear (which was repaired in the surgery of November 1985). Further, claimant did not describe to Dr. Johnson her physical activities outside of her employment.

On redirect examination, Dr. Johnson testified that a person in claimant's age bracket (57) was more likely to suffer an impingement syndrome as a result of the type of trauma he had earlier described. He reiterated his opinion that an impingement syndrome can be aggravated by either overhead activity or forward flexion. When asked whether a person's pushing on a weight of 20 pounds would be a forward flexion activity, the doctor stated, "If the pushing is done with the arm going forward from the body, yes." Although not certain before, Dr. Johnson was now of the opinion that claimant's shoulder impingement syndrome was aggravated by her work.

The evidence deposition of Dr. M. Adeli was also admitted into evidence at the request of General Electric. Dr. Adeli, an orthopedic surgeon and board certified, conducted an examination of the claimant at the request of General Electric on May 2, 1986. He was also furnished materials relating to claimant's case by her other doctor. In Dr. Adeli's opinion, claimant's job activities do not aggravate her condition and as long as the movement was up to the level of the head and not higher, it would not have much effect on the shoulder. The impingement syndrome could be caused by an injury or by other ailments, such as osteoarthritis or rheumatic arthritis, which can produce it or aggravate it. Dr. Adeli did not detect any specific work injury. He did state, however, that possible multiple minute trauma could produce an early small tear. This could, however, occur at work

or out of the workplace. Dr. Adeli would permit her to return to work for light duty only because she has quite a bit of disability in her right shoulder.

On cross-examination, Dr. Adeli testified that if claimant's job required her to lift her arms overhead fully extended to place an object, regardless of its weight, into a container, repetitively over a period of a year, such activity would not necessarily produce but could sometimes aggravate a shoulder impingement. Again, forward flexion motion in pushing on a weight of 20 to 50 pounds on a conveyor belt would rarely produce a shoulder impingement but it could aggravate it. While even in combination, Dr. Adeli did not believe the two movements described above would cause the shoulder impingement; however, if there was an impingement, those movements could aggravate it. When Dr. Adeli was asked whether there might be a causal connection between the claimant's work and her carpal tunnel syndrome, the following exchange took place:

"Q. Could the type of work that she had described to you have been any causal connection between—or is there any causal connection between that type of work and this carpal tunnel syndrome that was found in Miss Holycross?

A. Well, the type of repeated motion can produce more, I would say, especially lower part, not raising up. It could produce carpal tunnel or epicondylitis. Those are more often possible."

When questioned as to Dr. Johnson's opinion that claimant's shoulder impingement might have been aggravated by her work, Dr. Adeli indicated that under General Electric's description, it did not, but under claimant's description of her work activities, it could have aggravated her shoulder condition.

The arbitrator awarded benefits to claimant, finding that she had sustained accidental injuries on both February 6, 1985, and on June 25, 1985. He further found that claimant's condition as a result of the June 25, 1985, accident had not yet reached a permanent stage and awarded her benefits under section 19(b) (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(b)). The arbitrator also awarded penalties and attorney fees against General Electric. General Electric appealed.

On review, the Industrial Commission found that claimant failed to prove that she had sustained accidental injuries on either February 6, 1985, or June 25, 1985, but found that she had sustained accidental injuries arising out of and in the course of her employment on August 6, 1985. The Commission also found that timely notice of the accidental injuries was given and that there was a causal connection between

claimant's accidental injuries and her condition of ill-being. The Commission also reversed the award of penalties and attorney fees.

The Commission relied on Dr. Johnson's testimony that claimant's carpal tunnel syndrome, epicondylitis, and shoulder impingement syndrome were aggravated by her work activities. The Commission discounted the fact that claimant had indicated that her disability was not work related on the group insurance form, noting that claimant was not an expert in the definition of accident under the Workers' Compensation Act and that there was no prejudice to General Electric.

The Commission then concluded as follows:

"Based on the above and pursuant to *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026, 106 Ill. Dec. 235, which held that an injury is compensable under the Workers' Compensation Act where it has been shown to be caused by the performance of the claimant's job and has developed gradually over a period of time without requiring complete dysfunction or collapse, and that the date of an accidental injury in a repetitive trauma case is the date on which the injury 'manifests itself,' that is, the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person, the Commission finds in 85 WC 51439 that the Petitioner failed to prove she sustained accidental injuries arising out of and in the course of her employment on February 6, 1985 and finds in 85 WC 51440 that Petitioner sustained accidental injuries arising out of and in the course of her employment as the result of repetitive trauma on August 6, 1985, [rather than June 25, 1985] the day that Dr. Johnson took her off work because her employment aggravated her condition of ill-being."

General Electric then sought review before the circuit court of Vermilion County. Relying on *Peoria County Belwood Nursing Home v. Industrial Comm'n* and *Nunn v. Industrial Comm'n* (1987), 157 Ill. App. 3d 470, the circuit court confirmed the decision of the Commission that claimant had failed to prove that she sustained accidental injuries on February 6, 1985. However, the circuit court determined that the Commission's findings that claimant had failed to prove that she had sustained accidental injuries on June 25, 1985, but had, in fact, sustained them on August 6, 1985, were against the manifest weight of the evidence, and set aside those portions of the Commission's decision. The trial court also confirmed that part of the Com-

mission's decision denying attorney fees and penalties against General Electric.

The circuit court stated that the test set forth in *Peoria County Belwood Nursing Home v. Industrial Comm'n* does not require that the causal connection between the accidental injury and the claimant's state of ill-being be plainly apparent to a reasonable physician. Dr. Johnson's opinion on August 6, 1985, merely confirmed what was plainly apparent to a reasonable person on June 25, 1985. Therefore, the circuit court concluded, the substitution of the date of August 6, 1985, over June 25, 1985, by the Commission was error. This appeal by General Electric followed.

The sole issue on appeal is whether the decision of the Commission was against the manifest weight of the evidence.

At the outset, we find it instructive to note what is *not* on appeal, as well as what exactly is being appealed from. Apparently, all parties have accepted the Commission's determination that claimant suffered no compensable accident on February 6, 1985. Further, all parties have accepted the Commission's decision vacating the arbitrator's award of attorney fees and penalties to the claimant. Although in her prayer for relief the claimant asks that this court find, as did the Commission, that she suffered an accident due to repetitive trauma on August 6, 1985, claimant has not filed a cross-appeal as to that issue, and therefore, the circuit court order setting aside that finding of the Commission stands. Therefore, the only issue before the court is whether the Commission's determination that claimant did not suffer a compensable injury on June 25, 1985, is against the manifest weight of the evidence as the circuit court determined.

■ It is well settled that the findings of the Commission will not be disturbed unless they are against the manifest weight of the evidence. (*Ferrin Cooperative Equity Exchange v. Industrial Comm'n* (1976), 64 Ill. 2d 445, 448.) Further, the fact that an employee may have suffered from a preexisting condition will not preclude an award if the condition was aggravated or accelerated by the employment. (*Williams v. Industrial Comm'n* (1981), 85 Ill. 2d 117, 122.) After reviewing the record in this case, we are of the opinion that the decision of the Commission finding no compensable accident on June 25, 1985, was against the manifest weight of the evidence and that the circuit court was correct in determining that claimant had suffered a compensable injury on that date.

General Electric contends that claimant's condition is noncompensable because her shoulder problems were simply a continuation of a preexisting condition, and that her work provided no greater risk or

special strain than she would experience in performing everyday activities. General Electric argues that the record shows that claimant's condition preceded both the February and June dates she alleged she was injured on, and that she was being treated by Dr. Johnson in connection with her shoulder prior to the February 6, 1985, date. General Electric cites claimant's age, 57, and the fact that claimant testified that she had been having trouble with her shoulder since at least 1984, and that she had been treated since 1984 for bursitis and impingements. Finally, General Electric points to the fact that in filling out the group disability form, claimant indicated that her disability was not due to a work-related accident.

■ We first observe that the Commission chose to discount the significance of the group disability form on the basis that claimant had no expertise regarding the definition of the word "accident" under the Workers' Compensation Act. As the Commission is the judge of the credibility of the witnesses, we cannot say that its rejection of General Electric's argument in that regard was error.

General Electric's argument that claimant's condition was a continuation of a preexisting condition flies in the face of our supreme court's decision in *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, and the medical testimony introduced in this case.

■ In *Peoria County Belwood Nursing Home v. Industrial Comm'n*, our supreme court held that the Workers' Compensation Act encompasses those cases in which an employee's work-related injury is gradual rather than the result of a sudden and/or completely disabling trauma. However, the claimant is still required to show that the injury is work related and not the result of a normal degenerative aging process. 115 Ill. 2d at 530.

Claimant testified that she had been employed by General Electric for 26 years. Dr. Johnson testified that in his opinion, claimant's condition was or could be aggravated by the work she was performing. Further, Dr. Johnson also testified that a person of claimant's age was more likely to suffer impingement syndrome when subjected to trauma. Even Dr. Adeli, who examined claimant on behalf of General Electric, testified that claimant's work could have aggravated her condition if she performed in the manner described by claimant. General Electric disputes the fact that claimant, in order to perform her job, had to extend her arm over her head and relies on Dr. Adeli's opinion that in that case, claimant's work did not aggravate her preexisting shoulder condition.

There seems no disagreement that claimant suffered from a shoul-

der condition prior to the specific dates on which she claimed accidental injuries. Nonetheless, "[t]o deny an employee benefits for a work-related injury that is not the result of a sudden mishap or completely disabling penalizes an employee who faithfully performs job duties despite bodily discomfort and injury." (*Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 530.) The question then becomes did the work claimant performed for General Electric as of June 25, 1985, aggravate her preexisting condition, as claimant claims, or was it merely a continuation of claimant's preexisting condition, as is claimed by General Electric.

■ It is well settled that the Commission is the judge of the credibility of the witnesses and the weight to be given their testimony. It is for the Commission to decide which of the conflicting medical opinions given in a case is to be accepted. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 43.) Given Dr. Johnson's opinion that claimant's work aggravated her condition and Dr. Adeli's opinion that if claimant's job required her to reach above her head, this motion could have aggravated her condition, we cannot disagree with the conclusion of the arbitrator, the Commission, and the circuit court that claimant suffered a work-related injury.

■ We do, however, disagree with the Commission's conclusion that June 25, 1985, was not the date of the claimant's injury.

In *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 531, our supreme court held "that the date of an accidental injury in a repetitive-trauma compensation case is the date on which the injury 'manifests itself.' 'Manifests itself' means the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person."

The circuit court correctly observed that the test established in *Peoria County Belwood Nursing Home* does not require that the causal connection be plainly apparent to a reasonable physician. The fact that Dr. Johnson offered his opinion as to a causal connection between claimant's work and her condition of ill-being on August 6, 1985, although helpful, is not necessarily the date the injury "manifested itself." As the circuit court noted, it was on June 25, 1985, that claimant noticed the "sharp pain" when she attempted to shove ballasts to her position. We agree with the circuit court that it was on that date that the fact of the injury and causal connection would have become plainly apparent to a reasonable person. We conclude, therefore, that the Commission's determination that claimant did not suffer an accidental injury on June 25, 1985, was against the manifest

weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA and LEWIS, JJ., concur.

JUSTICE McCULLOUGH, dissenting:

As the majority states, the Commission in its decision found "[p]etitioner sustained accidental injuries arising out of and in the course of her employment as the result of repetitive trauma on August 6, 1985, [rather than June 25, 1985] the day that Dr. Johnson took her off work because her employment aggravated her condition of ill-being." (190 Ill. App. 3d at 854.) This decision is not against the manifest weight of the evidence.

We need only review the evidence which is indicated in the majority's disposition. In the latter part of 1984, she began to note pain in her right shoulder, took some action, and in January 1985 experienced breathing problems and was referred to a doctor. She continued to work during this time, and on June 25, 1985, she was getting ready to test the ballasts and after shoving about 20 ballasts down to her test set felt a sharp pain in her right shoulder which went into her neck. She went to the nurse, who gave her a pain pill, and she returned to work. In July of 1985, she took one week's vacation, returned to work, worked one week and then took two more weeks' vacation and returned to work. While on vacation, she was not bothered by pain in her shoulder, but as soon as she used pressure, the pain returned. It was then on August 6, 1985, that the claimant saw Dr. Johnson. He gave her inflammatory pills, an injection, and told the claimant to stay home from work. As the Commission stated in its decision, "the date of an accidental injury in a repetitive trauma case is the date on which the injury 'manifests itself,' that is, the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person." (190 Ill. App. 3d at 854.) As pointed out recently by the supreme court in *Sperling v. Industrial Comm'n* (1989), 129 Ill. 2d 416, 421-22:

> "[A] reviewing court will not set aside the decision of an administrative agency unless the findings are against the manifest weight of the evidence. *** We must, therefore, affirm, even though our decision, were we the trier of fact, may have been different."