CATERPILLAR TRACTOR COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Donald L. Hughes, Appellee).

Fourth District (Industrial Commission Division) No. 4—90—0159WC

Opinion filed June 5, 1991.—Rehearing denied July 31, 1991.

Forrest D. Serblin, of Peoria, for appellant.

G. Douglas Stephens, of Peoria, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Donald Hughes, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*) for injuries to his right arm and shoulder which arose out of and in the course of his employment for the respondent, Caterpillar Tractor Company. An arbitration hearing was held on the claimant's application on May 16, 1986, following which the arbitrator held that the claimant failed to prove that his accidental injuries arose out of and in the course of his employment on May 2, 1980, and denied him benefits. On review before the Industrial Commission (Commission), the Commission reversed the arbitrator's decision, finding that the claimant's injuries arose out of and in the course of his employment under a repetitive trauma theory. The Commission awarded the claimant temporary total disability for 13$\frac{3}{7}$ weeks and permanent partial disability for 25% loss of the use of his right arm. Subsequently, the circuit court confirmed the Commission's decision, and the respondent appeals.

On appeal, the respondent initially contends that the Commission improperly granted the claimant benefits under a repetitive trauma theory as the Commission considered this theory *sua sponte* for the first time on review. Secondly, the respondent claims that the Commission's decision that the claimant's injuries arose out of and in the course of his employment was against the manifest weight of the evidence. Before considering these issues, a statement of the facts is necessary.

The only testimony presented at the arbitration hearing was presented by the claimant. He testified that he had been employed by the respondent since May 7, 1973. On May 2, 1980, he was working as a shell machine operator, a job he had performed for approximately one year. Prior to his work as a shell machine operator, the claimant had worked as a pneumatic chipper for 5½ years. The claimant's work as a chipper had entailed the use of an air hammer to clean the "fins" and dirt from castings. His duties as a shell machine operator involved picking up cores for engine blocks by a hoist, pulling the cores around an overhead track, setting the cores down on another track, and pushing the cores down the line about 30 feet. The cores weighed over 100 pounds, and the claimant picked up and moved approximately 300 to 350 cores per day. The work performed by the claimant required a "lot of pushing and pulling and hoisting" of piece parts and required the

claimant to work with his arms overhead. The claimant also picked up and placed smaller cores by hand onto the other track.

On May 2, 1980, the claimant experienced extreme pain in his right shoulder, and his right arm went numb. The claimant went to the respondent's first aid station and sought treatment. The claimant told the first aid personnel that his right shoulder was hurting from "pulling and pushing on the hoist." At that time, the first aid personnel treated the claimant's right shoulder with heat packs. The claimant testified that he also saw the respondent's doctor in May 1980 for his right shoulder.

According to the claimant, prior to May 2, 1980, he had trouble with his right shoulder for a number of years, and, in the year immediately preceding May 2, 1980, he sought treatment for his hands and shoulders from the respondent's first aid station on numerous occasions. The treatments administered by the respondent's doctor and nurse were whirlpool baths for his hands and heat packs for his shoulders.

In addition to the treatment from the respondent's first aid station, in March 1980 the claimant sought treatment for his right shoulder from an outside doctor, Dr. David Conners. In March 1980, the claimant's right arm was painful and tended to "go numb" frequently. The claimant again saw Dr. Conners shortly after May 2, 1980. At that time, Dr. Conners recommended surgery on his right shoulder.

The claimant underwent surgery to his right shoulder in September 1980. From May 2, 1980, until his surgery on September 4, 1980, the claimant continued to work at his job as a shell machine operator; however, he received heat pack treatments on his right shoulder from the respondent's first aid station almost daily. The treatment with heat packs soothed his pain temporarily, but, when he resumed his work and used his shoulder, his pain returned.

After the claimant's surgery to his right shoulder in September 1980, he received physical therapy for four to six weeks. The claimant subsequently returned to work on December 8, 1980, with the restrictions that he not lift more than 40 pounds and that he not do overhead work. The claimant continued to work; however, he was laid off in November 1984 and was not working at the time of arbitration because of his layoff.

The claimant testified that he continues to suffer from pain in his right shoulder, but his surgery had relieved his pain somewhat. Additionally, if the claimant lifts his right arm too high, i.e., raises his elbow a little higher than his shoulder, he would experience a sharp pain in his shoulder and his shoulder would "give way." The claimant fur-

ther stated that if he uses his right arm too much, *e.g.*, if he mows the lawn with the lawn mower, his right arm becomes numb, and he has trouble sleeping that night.

On cross-examination, the claimant admitted that he had surgery for bilateral carpal tunnel syndrome in 1978, for which he filed a workers' compensation claim. At that time, the claimant received benefits for a 15% loss of use of each hand. It was due to this disability that the claimant was taken off the chipper job and was given the job as a shell machine operator. The claimant further admitted that he had been having complaints with his shoulder since 1976, after working 2½ years as a chipper. The claimant stated that the doctor told him he had osteoarthritis in his shoulder joint. The claimant denied that he told the respondent's first aid personnel and Dr. Conners that he had not had an injury to his shoulder.

The only other evidence presented at the arbitration hearing was the medical records of Methodist Hospital, the medical notes of Dr. Conners, the medical records from the respondent's first aid station, and weekly disability forms completed by the claimant. The medical records from the respondent's first aid station consisted of the following: On April 1, 1980, the nurse wrote that the claimant had been to the first aid station on March 27, 1980. The nurse's note indicated that the claimant had been having trouble with his right shoulder for the past month, and that the claimant had seen Dr. Conners the previous day (March 26, 1980). At that time, the doctor told him that he had arthritis and a "bad joint" in his shoulder. The nurse's note also stated that the claimant told her he knew of no injury to his shoulder.

The respondent's doctor's note of April 7, 1980, reported that the claimant complained of discomfort in his right AC (acromioclavicular) joint when his shoulder was put through a range of motion for his shoulder and also when pressure was applied to the AC joint. The doctor noted that the claimant is left-handed, but that he used his right hand to guide the hoist. The doctor diagnosed the claimant as having arthritis in his right shoulder and indicated in his note that the claimant's problems with his shoulder were not related to his occupation.

Another note written on April 30, 1980 (the record does not clearly indicate whether this note was written by the respondent's doctor or nurse as the note was initialled, although the ending initials appear to be M.D.), indicated that the claimant saw Dr. Conners on April 16, 1980, and that the claimant was again told he had arthritis of the right shoulder. The note further indicated that the claimant's right hand and shoulder bothered him when working with his hand overhead.

The medical note from the respondent's first aid station of May 8, 1981, indicated that the claimant still complained of pain in his right shoulder, arm, and hand because of his work. Another note entered on May 29, 1981, reported that the claimant had seen Dr. Conners on May 27, 1981, and that Dr. Conners had placed a 40-pound weight-lifting restriction on the claimant. A return-to-work slip dated May 27, 1981, from Dr. Conners indicated that the claimant could do light work, *i.e.*, work that did not aggravate his right shoulder.

A return-to-work pass, executed by the respondent's doctor, corroborated the claimant's testimony that he returned to work on December 8, 1980. Another report from Dr. J.R. Barron, medical director for the respondent, dated January 11, 1982, stated that the claimant was released to full work duties as of that date. Dr. Barron's report further indicated that Dr. Conners had removed the 40-pound weight-lifting restriction which the doctor had placed on the claimant on May 29, 1981.

Dr. Conners' records revealed that he had seen the claimant in March 1977, at which time the doctor's examination indicated that the claimant had bilateral carpal tunnel syndrome. The doctor ordered tests for the carpal tunnel syndrome and also indicated that the claimant was to "undergo an arthritis profine [*sic*]." In June 1977, the doctor found that the claimant's test results confirmed his diagnosis of carpal tunnel syndrome. The doctor also stated that the claimant "has had some problems with painful shoulders after working," and he placed the claimant on physical therapy for this. The doctor also saw the claimant in August and September 1977.

In April 1978, the doctor's notes indicated that the claimant continued to have problems with pain in his right shoulder, and because of this, Dr. Conners thought the claimant "should return and be seen by Dr. Shah for evaluation and treatment for the bursitis."

Dr. Conners saw the claimant again in July, August, and September 1978. The primary focus of the doctor's notes on those occasions was the claimant's carpal tunnel syndrome. At some point between the July and August visits, the claimant had undergone surgery for this problem.

The next visit documented in the doctor's notes was on March 26, 1980, at which time the claimant saw the doctor for the pain in his right shoulder. Dr. Conners stated in his note of that date as follows:

> "Has had some pain involving his right shoulder especially when required to work overhead. Exam demonstrates some crepitation of the right acromioclavicular joint with abduction. X-rays demonstrate rather marked osteoarthritis of this joint. The pa-

tient does not recall any injury to this area in the past, however, it was explained to him that at some point he most likely did injure this and now the problem is being aggravated with working overhead. At this time he was told that he should attempt to find work that did not require overhead forceful use of the arm."

Two subsequent entries in the doctor's notes, on April 16, 1980, and on May 12, 1980, indicated that on those respective dates a "To Whom It May Concern" letter was sent on behalf of the claimant, and a copy of the doctor's office notes of March 26, 1980, was sent to the respondent.

The next office visit by the claimant was on August 25, 1980, at which time the claimant continued to have considerable pain in his right shoulder. The doctor stated in pertinent part in this note as follows:

"He states that this [right shoulder] is painful even at rest and is especially aggravated by any use of the arm. Exam is essentially unchanged with crepitation over the right AC joint and x-rays [sic] demonstrate rather marked osteoarthritis."

The doctor advised claimant that surgery could be performed, but the doctor warned the claimant surgery occasionally does not provide any benefits; however, the claimant decided to have surgery. The doctor told the claimant that if the surgery were unsuccessful, he may have to change his type of employment. The subsequent notes made by the doctor were of the claimant's follow-up examinations after his surgery.

Two letters from Dr. Conners were also admitted into evidence. The first letter was the "To Whom It May Concern" letter documented in the doctor's notes. This letter, dated April 16, 1980, indicated that the claimant had recurrent problems with pain in his shoulder, especially when working overhead. It was advised that another type of work should be found for the claimant which did not require overhead work. The other letter admitted was a letter to Dr. Barron dated May 29, 1981. In this letter, Dr. Conners indicated that the claimant had surgery on his right shoulder. Dr. Conners stated that "X-rays and clinical exam demonstrate that his status is essentially unchanged. However, as was stated previously, this shoulder may be aggravated by his performing heavy lifting with the right upper extremity especially if this is overhead." Dr. Conners suggested that the claimant's work be modified so as not to aggravate his problem.

The medical records of Methodist Hospital confirmed that the claimant had decompression surgery for his bilateral carpal tunnel syndrome on August 14, 1978, and that his prognosis was good following

the surgery. Additionally, the medical records of the claimant's surgery to his right shoulder were admitted into evidence. These records indicated that on September 8, 1980, the claimant underwent surgery wherein excision of the distal end of the right clavicle was performed. The report of the operation stated: "Examination of the AC joint demonstrated that there was complete destruction of the cartilaginous surface with calcification of the meniscus." Both the preoperative and postoperative diagnosis of the claimant's condition was osteoarthritis of the right AC joint.

Lastly, the claimant offered into evidence weekly disability forms and corresponding physician's forms provided by the respondent which the claimant and Dr. Conners had completed. The first form completed by the claimant was dated September 7, 1980, and, on this form, the claimant gave the date of the accident as April 22, 1980. The claimant described the accident as follows: "excessive lifting and over head [sic] working while running [the] shell machine." The corresponding physician's report gave the diagnosis of the claimant's condition as "Right shoulder acromioclavicular joint, degenerative joint disease." The doctor did not answer the question on the form as to whether the claimant's disability was caused by an injury at work. The second disability form completed by the claimant on December 1, 1980, gave March 12, 1980, as the date of accident. The description of the accident given by the claimant on this form was: "[d]ue to excessive lifting and over head [sic] work." The corresponding physician's form completed by Dr. Conners gave the same diagnosis as the previous form and, once again, the doctor did not answer the question as to whether the claimant's disability was caused by an injury at work.

Following this evidence, the arbitrator found that the claimant was 31 years of age at the time of his injury and that the claimant failed to trace the onset of his right shoulder complaints to an accident on May 2, 1980. Therefore, the arbitrator held that the claimant failed to prove that his injuries arose out of and in the course of his employment and denied him benefits. As noted previously, the Commission, without considering additional evidence, reversed the decision of the arbitrator and found that the claimant's injuries arose out of and in the course of his employment on March 26, 1980, under a repetitive trauma theory. Subsequently, the Commission's decision was confirmed by the circuit court.

The first issue raised by the respondent on appeal is that the Commission improperly granted the claimant benefits under a repetitive trauma theory. The respondent argues that the Commission's decision was improper as the claimant did not present this theory at arbitration

and as the Commission *sua sponte* considered this theory for the first time on review. It is the respondent's contention that the claimant's theory at arbitration was that his injuries arose as a result of a specific accident on May 2, 1980, the date of accident given in the claimant's application for adjustment of claim, and that the claimant did not successfully prove this theory. The respondent further argues that the claimant failed to present additional evidence before the Commission and failed to amend his application for adjustment to claim to conform with a repetitive trauma theory and that the claimant should not be able to prevail under this theory.

Similarly, because the Commission found that the claimant's injuries arose out of and in the course of his employment under a repetitive trauma theory, the respondent claims it was prejudiced as the evidentiary requirements for defending a repetitive trauma theory are different than those required to defend a specific accident theory, and it was not given an opportunity to counter the repetitive trauma theory. The respondent cites *General Telephone Co. v. Industrial Comm'n* (1988), 167 Ill. App. 3d 420, 521 N.E.2d 287, in support of its contention that the claimant could not introduce a new theory of recovery at the review hearing before the Commission.

■ Initially, it must be noted that the case relied upon by the respondent is not dispositive of this issue. In *General Telephone Co.*, the claimant attempted to introduce a new theory of recovery (repetitive trauma) before the appellate court for the first time. Additionally, in *General Telephone Co.*, there was no evidence presented that the claimant had any problems, *i.e.*, prior back pain, before the date given as his date of injury. Here, the repetitive trauma theory was discussed for the first time by the Commission in its decision as opposed to being considered for the first time before the appellate court. Secondly, as will be considered later in this opinion, there was evidence presented of the claimant's prior problems with his right shoulder before the date of the alleged accident which could support a repetitive trauma theory and evidence presented that it was the repetitive motions of the claimant's work which had caused his injury. Therefore, *General Telephone Co.* is not helpful in resolving this issue. Furthermore, our research has not turned up any case on point; therefore, it appears that this issue is one of first impression in Illinois.

■ We now consider whether the Commission can consider a new theory of recovery for the first time in a case on review. In this regard it is well established that, although a case brought before the Commission is in essence an appeal, it is also clear that the Commission has original jurisdiction in cases which come before it. (*Orkin Exterminat-*

*ing Co. v. Industrial Comm'n* (1988), 172 Ill. App. 3d 753, 526 N.E.2d 861.) Because of this, the Commission is not bound by the arbitrator's findings, even where the Commission merely reviews the evidence presented at arbitration. (*Orkin Exterminating Co.*, 172 Ill. App. 3d 753, 526 N.E.2d 861.) Since the Commission has original jurisdiction and can consider new evidence not presented before an arbitrator, the Commission can, unlike the appellate court, consider a new theory of recovery in a case brought on review. However, this determination does not bring our analysis of this issue to an end.

 █ The next consideration must be under what circumstances the Commission can consider a new theory of recovery on review, *i.e.*, must the claimant amend his application for adjustment of claim to reflect the actual theory of recovery in order for the Commission to consider it, or may the Commission consider a new theory *sua sponte*. The respondent's position is that a claimant's award must be restricted to the theory of recovery alleged in his application. The respondent likens an application for adjustment of claim to pleadings in a civil case, wherein a claimant presents the theory of recovery under which he is proceeding, and the opposing party is made aware of what evidence he must present to defend his position. While an application has been held to be "in the nature of a pleading" (*Fleming v. Industrial Comm'n* (1983), 95 Ill. 2d 329, 335, 447 N.E.2d 819, 821), and, as such, can be liberally amended, the applicable rules for an application for adjustment of claim are not as formal as the rules for pleadings. (*Fleming*, 95 Ill. 2d 329, 447 N.E.2d 819.) Additionally, an amendment of an application for adjustment of claim has been allowed where the amendment was to conform the pleadings to proof presented in the record. (*McLean Trucking Co. v. Industrial Comm'n* (1983), 96 Ill. 2d 213, 449 N.E.2d 832; *Reliance Elevator Co. v. Industrial Comm'n* (1988), 171 Ill. App. 3d 18, 524 N.E.2d 1022.) Thus, it is clear that had the claimant attempted to amend his application for adjustment of claim to reflect a repetitive trauma theory at any time before the Commission entered its final decision, he would have been permitted to do so; however, as the respondent correctly notes, this the claimant did not do. Therefore, our next consideration must be whether the Commission can consider a new theory of recovery *sua sponte*.

██ It has been stated in Larson as follows:

> "Compensation procedure is generally as summary and informal as is compatible with an orderly investigation of the merits. This applies to pleadings, process, hearings, awards and appeals, although time periods for appeal are strictly enforced in many jurisdictions. Moreover, when the rule whose relaxation is

in question is more than a merely formal requirement and touches substantial rights of fair play, no relaxation is justified; such a rule is that forbidding the raising on appeal of an issue that has not been raised below." (2B A. Larson, Workmen's Compensation Law §77A.00, at 15—1 (1989).)

Larson goes on to state:

"The adjective law of workmen's compensation, like the substantive, takes its tone from the beneficient and remedial character of the legislation. Procedure is generally summary and informal. *** The whole idea is to get away from the cumbersome procedures and technicalities of pleading, and to reach a right decision by the shortest and quickest possible route. On the other hand, as every lawyer knows, there is a point beyond which the sweeping-aside of 'technicalities' cannot go, since evidentiary and procedural rules usually have an irreducible hard core of necessary function that cannot be dispensed with in any orderly investigation of the merits of a case." (2B A. Larson, Workmen's Compensation Law §77A.10, at 15—1 through 15—5 (1989).)

It is also set forth in Larson that:

"In pleadings under a compensation act, calling things by wrong names, or bringing a petition under a wrong title, or making other harmless mistakes as to details such as dates, are immaterial if the intention of the pleading is clear." (2B A. Larson, Workmen's Compensation Law §77A.42, at 15—27 through 15—31 (1989).)

We lastly note that Larson states that:

"As to variance between pleadings and proof, wide latitude is allowed." (2B A. Larson, Workmen's Compensation Law §77A.45, at 15—41 (1989).)

From the foregoing passages, it is clear that the pleadings and the proceedings in workers' compensation cases are informal and are designed to expedite and to achieve a right result. Thus, the Commission must decide a case on the evidence presented and on the merits of the case before it and must not be restricted to the information provided on a form. The Commission's decision in the instant case was properly decided on the evidence admitted and not on a specific theory presented. While a Commission must decide a case on its merits, it is also clear that a party's substantial rights must not be prejudiced by the Commission's relaxation of its requirements.

■ In the case *sub judice*, it seems that to reverse outright the Commission's decision because it considered a repetitive trauma theory

without that theory being presented by either party would not be fair to the claimant, as the evidence (as will be discussed later) indicated that the claimant was injured through the repetitive motions of his work and supported a repetitive trauma theory. On the other hand, to obligate the respondent for the claimant's benefits without giving the respondent an opportunity to defend its position under that theory may be construed as being prejudicial to the respondent's substantial rights. However, under the facts of this case, we find that the respondent's substantial rights were not unduly prejudiced by the Commission's determination that the claimant was entitled to benefits under a repetitive trauma theory. Dr. Conners' medical notes of March 26, 1980, which were provided to the respondent prior to the arbitration hearing, sufficiently alerted the respondent that it was the claimant's repetitive overhead work with his right arm which aggravated his pre-existing condition. Furthermore, the respondent was in possession of the weekly disability forms completed by the claimant in which he stated that it was the repetitive nature of his work which was responsible for his injury. Thus, the respondent was aware of this evidence of repetitive trauma, but the respondent failed to refute these facts despite the advance knowledge of this evidence. Therefore, reversal of the Commission's decision is not mandated since the respondent was not prejudiced where it had an opportunity to counter the claimant's evidence and did not do so.

It should be noted that the claimant's failure to amend his application for adjustment of claim may possibly be explained (besides the obvious explanation that amendment of an application is not possible after the Commission has entered a final decision) by the timing of this case. The claimant filed his application for adjustment of claim in 1981. The arbitration hearing was not held until 1986, and the Commission's decision was not entered until 1988. The principles of the repetitive trauma theory of recovery were presented in the case of *Peoria County Belwood Nursing Home v. Industrial Comm'n* (1987), 115 Ill. 2d 524, 505 N.E.2d 1026. Thus, it is apparent that the arbitrator's decision came before the decision in *Peoria County Belwood Nursing Home*, while the Commission's decision came after that decision.

■ The respondent's next contention is that the Commission's decision that the claimant's injuries arose out of and in the course of his employment under a repetitive trauma theory was against the manifest weight of the evidence. The law is well established that the Commission's decision will not be overturned on review unless its determination is against the manifest weight of the evidence. (*General Electric Co. v. Industrial Comm'n* (1989), 190 Ill. App. 3d 847, 546

N.E.2d 987.) Additionally, even if an employee suffers from a preexisting condition, he will not be precluded from receiving an award if it is shown that the claimant's condition was aggravated or accelerated by his employment. (*General Electric Co.*, 190 Ill. App. 3d 847, 546 N.E.2d 987.) This has been held to be so even in a case where the preexisting condition was aggravated by the repetitive nature of the employment. (*General Electric Co.*, 190 Ill. App. 3d 847, 546 N.E.2d 987.) However, a claimant is still required, under a repetitive trauma theory, to show that his injury is work related and not the result of a normal degenerative aging process. *General Electric Co.*, 190 Ill. App. 3d 847, 546 N.E.2d 987.

██ Here, the evidence presented by the claimant was sufficient to support the Commission's decision. The claimant's testimony established that for a year prior to May 2, 1980, he performed a job which required him to push or pull with his right hand overhead a 100-pound object over 300 times a day. This evidence was unrebutted and was certainly sufficient to show the repetitive nature of his work. The claimant also testified that his right shoulder problems had existed for some time before March or May 1980.

The medical evidence presented, *i.e.*, the medical notes of Dr. Conners and a letter written by him, indicated that the claimant's overhead work aggravated his preexisting condition. This evidence was also unrebutted. (The only evidence presented by the respondent was Dr. Conners' notes which showed the claimant had prior problems with his right shoulder and which were apparently presented to show that the claimant had not received his injury from a specific accident at work, and the respondent's first aid records in which the respondent's doctor gave an unsubstantiated opinion that the claimant's problems were nonoccupational.)

For the foregoing reasons, the judgment of the circuit court of Mason County, confirming the Industrial Commission's decision, is affirmed.

Affirmed.

McCULLOUGH, P.J., and McNAMARA, WOODWARD, and STOUDER, JJ., concur.