Docket No. 101109.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

DEANA DURAND, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (RLI Insurance Company, Appellee).

*Opinion filed October 19, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman and Kilbride concurred in the judgment and opinion.

Justice Garman dissented, with opinion, joined by Justice Karmeier.

Justice Burke took no part in the decision.

## OPINION

Deana Durand filed a claim for benefits under the Workers' Compensation Act (see 820 ILCS 305/1 *et seq.* (West 2004)) after she developed carpal tunnel syndrome. The Illinois Industrial Commission[1] found that Durand's injury manifested itself more than three years before she filed her claim, and thus her claim was time barred. See 820 ILCS 305/6(d) (West 2004). The trial court confirmed the Commission's decision, and the appellate court affirmed the trial court's decision. The central issue in this case is whether the Commission's decision was against the manifest weight of the evidence. For the reasons that follow, we reverse and remand.

## BACKGROUND

In 1990, Durand was hired as a clerical worker at RLI Insurance Company (RLI), and in 1993, she became a policy administrator. As a policy administrator, Durand scanned insurance policies into a computer and typed on a computer keyboard for several hours each day. On January 29, 1998, Durand informed her supervisor that she noticed pain in her hands several months earlier, in September or October of 1997, and that she believed the pain was work-related. Durand continued working, and the pain in her hands increased. She eventually sought medical help.

Dr. Lestel Escorcia examined Durand on August 15, 2000. In her notes, Dr. Escorcia stated that Durand reported hand and wrist pain radiating up to her elbows and constant tingling and numbness in her fingers and hands. These symptoms had continued "on and off" for 1½ years. Durand told Dr. Escorcia that she had worked at a computer keyboard for seven to eight years, and Dr. Escorcia concluded that Durand's hand and wrist pain were "probably carpal tunnel." She referred Durand to Dr. Gregory Blume for a nerve study to confirm this preliminary diagnosis.

---

[1] Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." See 820 ILCS 305/1(c) (West 2004). When it decided this case, it was still known as the Industrial Commission. We will use that name.

Dr. Blume examined Durand on September 8, 2000. In his notes, Dr. Blume stated that Durand complained of "bilateral wrist and right elbow pain," as well as "some numbness and tingling." These symptoms had progressed for two years, deteriorating when she worked and improving when she did not. Dr. Blume performed a nerve study, or EMG test, which revealed "very mild or early right median nerve entrapment at the wrist (carpal tunnel syndrome)." He concluded that Duran's condition was, "by history, *** very work-related."

Dr. Jay Pomerance examined Durand on November 6, 2000, at the request of RLI's insurer. In a November 8, 2000, letter, Dr. Pomerance stated that Durand mentioned "gradual onset," in mid-2000, of pain radiating from her right wrist, then numbness in her right fingers and thumb, and later numbness in her left fingers. According to Dr. Pomerance, Durand "did have prior symptoms approximately eighteen months ago but these were not that bothersome to her." Dr. Pomerance reviewed the September 8, 2000, nerve study results and agreed with Dr. Blume's diagnosis: "The patient's current clinical condition is consistent with a borderline right carpal tunnel syndrome along with pain in the left hand." Based on Durand's description of her job, however, he suggested no activity restrictions. In a November 20, 2000, letter, written after viewing a videotape of Durand at work, Dr. Pomerance stated, "I would not expect this job to cause or aggravate upper extremity pathology such as carpal tunnel syndrome." There was no causal relationship, according to Dr. Pomerance, between Durand's work activities and her carpal tunnel syndrome. Dr. Pomerance's deposition testimony was consistent with his notes.

Dr. Conner, an orthopedic surgeon, first examined Durand on November 29, 2000. In his notes, Dr. Conner stated that Durand had worked at RLI for more than nine years, performing "continuous computer entry work during her eight-hour shift." According to Dr. Conner, she "developed problems with both arms six or seven months ago." Dr. Conner noted that Dr. Blume had performed a nerve study and diagnosed Durand with "mild early right median nerve entrapment or carpal tunnel syndrome." Dr. Conner's impression was

"[b]ilateral carpal tunnel syndrome," which from her history apparently developed "secondary to her work activity." Dr. Conner again examined Durand on December 20, 2000. In his notes, Dr. Conner stated that Durand had met with Dr. Pomerance:

"From her description to me she tells me that 90% of her work was using the computer. In [Dr. Pomerance's] letter this part of it was down played considerably, but on discussing it with her she tells me that the majority of her work is computer activity. Thus as I thought previously in my opinion her carpal tunnel [syndrome] is caused or aggravated by her work."

The following week, Durand scheduled surgery with Dr. Conner.

On January 12, 2001, Durand filed an application for benefits with the Industrial Commission, asserting that she had experienced "serious and permanent" injury to "both wrists and upper extremities" from "repetitive data entry" for RLI. Durand's application listed September 8, 2000, the date Dr. Blume performed the nerve study and conclusively diagnosed her carpal tunnel syndrome, as the date of the accident. Dr. Conner performed surgery to repair Durand's right median nerve on February 12, 2001 and her left median nerve on June 4, 2001.

Dr. Robert Martin examined Durand on August 7, 2001, at the request of her attorney. In an October 29, 2001, evidence deposition, Dr. Martin testified that Durand told him she had worked at a computer keyboard for 6½ hours each day for the past eight years. Two years earlier, she developed pain in both wrists, as well as numbness in her fingers. According to Dr. Martin, carpal tunnel syndrome generally manifests itself as "either numbness, tingling or pain and combinations thereof," and these symptoms continue if the employee experiencing them continues to perform the same work. Dr. Martin testified that if Durand had experienced such symptoms in 1997, they "certainly could have been" a manifestation of carpel tunnel syndrome. Dr. Martin opined that Durand's work activities contributed to her development of carpel tunnel syndrome.

On May 9, 2002, an arbitration hearing was held. Durand testified that she never had hand or wrist problems before she worked for RLI. On cross-examination, RLI's attorney asked Durand about her January 29, 1998, conversation with coworker Karen Andell:

"Q. *** [D]o you recall telling [Andell] *** that your symptoms in your hands, right and left, started in September or October of 1997?

A. I could have.

Q. Do you recall having a problem at that time?

A. I guess I could have, but I didn't know at the time what it was.

Q. Do you recall telling Ms. Andell that you told your supervisor at that time that you believed the condition was work-related?

A. This was back in '98?

Q. Yes, January 29th, 1998, that you recall reporting the incident–

A. Oh, yes.

Q. So, in your mind you believe that your condition back in September or October of '97 was work-related?

A. Yes.

Q. And your job duties remained the same thereafter; is that correct?

A. Yes."

On redirect examination, Durand reiterated that she felt her pain was work-related in 1997:

"Q. And that opinion that you gave, was that your opinion, was that an opinion that had been given to you by your doctor? How did you reach that opinion?

A. It was my opinion, because of the pains I was having.

Q. That was your expert opinion?

A. Yes."

On re-cross-examination, Durand again discussed her symptoms in 1997. Durand repeated that she told her

supervisor that she was convinced her condition was work-related.

Again, on redirect examination, Durand stated that, at that time, no doctor had diagnosed carpal tunnel syndrome. On re-cross-examination, RLI's attorney asked:

> Q. Did you think you had carpel tunnel then from what you knew?
>
> A. I wasn't sure because it wasn't real constant and real severe at the time.
>
> Q. You had heard of carpel tunnel syndrome, though; is that correct?
>
> A. I think I might have heard of it.
>
> Q. And you knew people who had it or had had it?
>
> A. Yes.
>
> Q. And it was your belief that you had that condition and you felt that it was due to your job duties; is that correct?
>
> A. Yes."

In a June 4, 2002, decision, the arbitrator found that Durand sustained a repetitive-trauma accident caused by her work. Further, according to the arbitrator, "While [Durand] had experienced symptoms of carpal tunnel syndrome well before ***, the first time that she had received an EMG, and been officially diagnosed with carpal tunnel syndrome was September 8, 2000." The arbitrator decided that Durand's claim fell within the limitations period and awarded her medical expenses, as well as weekly compensation for temporary total disability and permanent partial disability in her right and left hands.

On July 18, 2002, RLI filed a petition for review, and on September 12, 2003, the Industrial Commission reversed the arbitrator's decision. The Commission found that Durand used a keyboard for approximately six hours per day. The Commission reviewed her testimony about when her symptoms appeared. Durand stated four times during the arbitration hearing that she experienced pain in her hands and wrists in September or October of 1997 and that she believed

this pain was work-related. The Commission stated: "Upon reviewing the events of September 8, 2000, the Commission finds that with the exception of [Durand] undergoing an EMG test, there was no specific event that took place on that date. *** Based on [Durand's] testimony, the Commission finds that the September/October date is the date of accident/'manifestation date' and said date was the date when the fact of the injury and its causal relationship to her employment was plainly apparent to [Durand] and to a reasonable person alike." Consequently, she filed her claim outside the three-year limitations period.

One commissioner wrote a concurring opinion, and one commissioner wrote a dissenting opinion. The concurring commissioner noted:

> "The fact that on September 8, 2000, a medical diagnosis was attached to [Durand's] condition does not indicate that [her] condition or its cause were, for 'manifestation' reasons, then newly apparent or reasonably should have been. Insofar as the records *** or her testimony *** are concerned, we only can determine that Dr. Blume believed there was a work related cause. There is no evidence that on September 8, 2000, this was conveyed to [Durand]. The statement to Karen Andell indicates [Durand], as early as 1997, was fully aware of her hand condition, knew about carpal tunnel syndrome, knew people who had it, felt she had it and that it was due to her job duties ***. A reasonable person with such knowledge and experience would then have known both of her condition and its relationship to her work."

The dissenting commissioner observed that Durand "continued to perform essentially the same job activities for several years preceding the onset of her symptoms in late 1997 to the time she finally sought medical treatment in August 2000." According to the dissenting commissioner, there is no authority for the proposition that the earliest onset of symptoms is the manifestation date. In fact, such a rule is contrary to the axiom that the Workers' Compensation Act should be liberally

construed to accomplish its purposes. The dissenting commissioner concluded:

> "At best, the majority has used the date Petitioner became aware of a *potential disability* as the manifestation date. Their narrow interpretation penalizes her for giving her employer notice of a potential disability, for not immediately seeking medical attention, and for continuing to perform her regular work for the same employer, notwithstanding a suspicion that she might be developing work related carpal tunnel syndrome. I fail to see what legitimate policies are served by their interpretation." (Emphasis in original.)

Durand filed a judicial review complaint, and the trial court confirmed the Commission's decision. The appellate court affirmed the trial court's decision. 358 Ill. App. 3d 239. Illinois law, asserted the appellate court, "does not require that a claimant's injury must have been diagnosed by a physician or that a physician have opined that the injury is causally related to her employment. [Citation.] Rather, manifestation of a repetitive trauma injury occurs when the fact of injury and causation would have become plainly apparent to a reasonable person." 358 Ill. App. 3d at 244. Here, Durand testified that in 1997 she felt pain in her wrists and believed this pain was work-related, even though she "wasn't sure" that she had carpal tunnel syndrome. 358 Ill. App. 3d at 245. The appellate court found "sufficient evidence" to support the Commission's finding that Durand's injury manifested itself in 1997; her claim was filed more than three years later and was thus time-barred. 358 Ill. App. 3d at 245.

Justice Holdridge, joined by Justice Donovan, dissented. 358 Ill. App. 3d at 245 (Holdridge, J., dissenting, joined by Donovan, J.). Justice Holdridge noted that Durand filed her claim on January 12, 2001; he thus looked back three years to January 12, 1998. 358 Ill. App. 3d at 246 (Holdridge, J., dissenting, joined by Donovan, J.). Although Durand informed her supervisor of her general pain in 1997, it was "on and off," and not "real constant and real severe." 358 Ill. App. 3d at 246 (Holdridge, J., dissenting, joined by Donovan, J.). According to Justice Holdridge, Durand's "intermittent discomfort" left her

unsure she even had carpal tunnel syndrome, and her "mere belief that she had the condition" was insufficient to make it plainly apparent to a reasonable person. 358 Ill. App. 3d at 246 (Holdridge, J., dissenting, joined by Donovan, J.). Justice Holdridge asserted that the date of the accident or manifestation date was not before January 12, 1998, and Durand's claim was timely. 358 Ill. App. 3d at 246 (Holdridge, J., dissenting, joined by Donovan, J.).

We granted Durand's petition for leave to appeal. 177 Ill. 2d R. 315(a).


## ANALYSIS

Durand raises two issues: (1) whether the Industrial Commission's decision setting the date of the accident on an unspecified date in either September or October 1997 was against the manifest weight of the evidence; and (2) whether this decision was contrary to Illinois law.

The Industrial Commission is the ultimate decisionmaker in workers' compensation cases, and it is not bound by any decision made by the arbitrator. *Cushing v. Industrial Comm'n*, 50 Ill. 2d 179, 181-82 (1971). Instead, the Commission must weigh the evidence presented at the arbitration hearing and determine where the preponderance of that evidence lies. See *Steiner v. Industrial Comm'n*, 101 Ill. 2d 257, 260 (1984); *Wagner Castings Co. v. Industrial Comm'n*, 241 Ill. App. 3d 584, 594 (1993) ("it is *solely* within the province of the Commission" to weigh the evidence (emphasis in original)). A reviewing court will not reverse the Commission unless its decision is contrary to law (see *Butler Manufacturing Co. v. Industrial Comm'n*, 85 Ill. 2d 213, 216 (1981)) or its fact determinations are against the manifest weight of the evidence (see *Shockley v. Industrial Comm'n*, 75 Ill. 2d 189, 193 (1979)). A reviewing court will not reweigh the evidence, or reject reasonable inferences drawn from it by the Commission, simply because other reasonable inferences could have been drawn. See *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 65 (1982); *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982). Fact determinations are against the manifest

weight of the evidence only when an opposite conclusion is clearly apparent–that is, when no rational trier of fact could have agreed with the agency. See *D.J. Masonry Co. v. Industrial Comm'n*, 295 Ill. App. 3d 924, 930 (1998).

Section 6(d) of the Workers' Compensation Act provides that an injured employee must file a workers' compensation claim "within 3 years after the date of the accident." 820 ILCS 305/6(d) (West 2004). When the accident is a discrete event, the date of the accident is easy to determine: it is, obviously, the date that the employee was injured. When the accident is not a discrete event, this date is harder to specify. An employee who suffers a repetitive-trauma injury still may apply for benefits under the Act, but must meet the same standard of proof as an employee who suffers a sudden injury. See *AC&S v. Industrial Comm'n*, 304 Ill. App. 3d 875, 879 (1999); *Nunn v. Industrial Comm'n*, 157 Ill. App. 3d 470, 480 (1987). That means, *inter alia*, an employee suffering from a repetitive-trauma injury must still point to a date within the limitations period on which both the injury and its causal link to the employee's work became plainly apparent to a reasonable person. *Williams v. Industrial Comm'n*, 244 Ill. App. 3d 204, 209 (1993). Setting this so-called manifestation date is a fact determination for the Commission. *Palos Electric Co. v. Industrial Comm'n*, 314 Ill. App. 3d 920, 930 (2000).

Here, Durand argues that the Commission's finding that her injury occurred sometime in September or October 1997 was against the manifest weight of the evidence. She contends that September 8, 2000, the date she was conclusively diagnosed with carpel tunnel syndrome, was the date of the accident; consequently, her January 12, 2001 claim was timely. Durand also argues that the Commission's finding was unfair, unrealistic, and contrary to law. According to Durand, Illinois cases have looked at the date when the employee requires medical treatment or becomes unable to work in determining when an injury manifested itself. Durand asserts that an injury in a carpal tunnel syndrome workers' compensation case cannot be established before the employee seeks medical consultation to confirm such a condition. RLI responds that the

Commission's findings were consistent with Illinois law and were not against the manifest weight of the evidence.

Initially, we reject Durand's argument that the decisions below were contrary to Illinois law. The appellate court, the trial court, and the Industrial Commission all employed the correct standard in determining when her injury manifested itself. That standard comes from *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524 (1987). In *Peoria County*, an employee in a nursing home laundry room experienced pain, numbness, and tingling in her hands and fingers on October 4, 1976, and consulted a neurologist regarding these symptoms the next day. The employee continued to work for nearly a year, then underwent outpatient carpal tunnel surgery on August 23, 1977. She filed a workers' compensation claim the next day, alleging that she developed carpal tunnel syndrome as a result of her work. The arbitrator awarded temporary and permanent total disability benefits. The Industrial Commission affirmed that decision; the trial court, in turn, confirmed the Commission's decision. The appellate court affirmed the trial court's decision.

This court framed the issue as "whether an injury sustained as a result of work-related repetitive trauma is compensable under the Workers' Compensation Act without a finding that the injury occurred as a result of one specific incident traceable to a definite time, place and cause." *Peoria County Nursing Home*, 115 Ill. 2d at 527. We stated that the purpose behind the Workers' Compensation Act is best served by allowing compensation where an injury is gradual but linked to the employee's work. *Peoria County*, 115 Ill. 2d at 529. We continued:

> "Requiring complete collapse in a case like the instant one would not be beneficial to the employee or the employer because it might force employees needing the protection of the Act to push their bodies to a precise moment of collapse. Simply because an employee's work-related injury is gradual, rather than sudden and completely disabling, should not preclude protection and benefits. *** To deny an employee benefits for a work-related injury that is not the result of

a sudden mishap *** penalizes an employee who faithfully performs job duties despite bodily discomfort and damage." *Peoria County*, 115 Ill. 2d at 529-30.

We then discussed the limitations period. The employer argued that the employee's claim was time-barred because the injury was not traceable to a specific date. *Peoria County*, 115 Ill. 2d at 530. We agreed with the appellate court that the date of the injury in a repetitive-trauma compensation case is the date when the injury manifests itself–"the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person." *Peoria County*, 115 Ill. 2d at 531, citing 1B A. Larson, Workmen's Compensation §39.50 (1985). The employee experienced pain, numbness, and tingling in her hands and fingers on October 4, 1976; these symptoms were severe enough that she sought medical treatment the next day. *Peoria County*, 115 Ill. 2d at 531. Thus, October 4 was the last day that the employee worked before the fact of her injury and its causal connection to her work became apparent. *Peoria County*, 115 Ill. 2d at 531. We concluded that because she filed her claim less than three years later, her claim was timely. *Peoria County*, 115 Ill. 2d at 531.

The appellate court has applied *Peoria County* in several carpal tunnel syndrome cases, and some of these cases provide useful insight regarding how to determine the manifestation date. In *Oscar Mayer & Co. v. Industrial Comm'n*, 176 Ill. App. 3d 607 (1988), an employee cut meat at a slaughterhouse for 15 years. In 1981, he experienced numbness, tingling, and burning in his hands and elbows. The employer's doctor examined the employee and performed an EMG test. The doctor told the employee that he suffered from bilateral carpal tunnel syndrome, and the employee refused surgery, opting for more conservative treatment. A year later, the employee's doctor performed a second EMG test, which indicated that the employee's condition was deteriorating. Another year later, the doctor performed a third EMG test, which confirmed that the employee's condition was still deteriorating. The employee had surgery on May 12, 1983. On

April 5, 1984, the employee filed a workers' compensation claim, listing his date of injury as the date he had surgery. The arbitrator awarded benefits to the employee, but the trial court reversed, concluding that the employee failed to prove that the date he had surgery was the date of accident.

The appellate court reversed the trial court. *Oscar Mayer*, 176 Ill. App. 3d at 608. According to the appellate court, the employee acknowledged that he knew of his injury and its relationship to his work before he had surgery. *Oscar Mayer*, 176 Ill. App. 3d at 608. The appellate court, however, refused to read *Peoria County* narrowly:

> "By their very nature, repetitive-trauma injuries may take years to develop to a point of severity precluding the employee from performing in the workplace. An employee who discovers the onset of symptoms and their relationship to the employment, but continues to work faithfully for a number of years without significant medical complications or lost working time, may well be prejudiced if the actual breakdown of the physical structure occurs beyond the period of limitation set by statute. [Citation.] Similarly, an employee is also clearly prejudiced in the giving of notice to the employer [citation] if he is required to inform the employer within 45 days of a definite diagnosis of the repetitive-traumatic condition and its connection to his job since it cannot be presumed the initial condition will necessarily degenerate to a point at which it impairs the employee's ability to perform the duties to which he is assigned. Requiring notice of only a *potential* disability is a useless act since it is not until the employee actually becomes disabled that the employer is adversely affected in the absence of notice of the accident." (Emphasis in original.) *Oscar Mayer*, 176 Ill. App. 3d at 611.

The appellate court stated that "fact of the injury" is not synonymous with "fact of discovery." *Oscar Mayer*, 176 Ill. App. 3d at 611, citing *Peoria County*, 115 Ill. 2d at 531. That is, the date on which the employee notices a repetitive-trauma injury is not necessarily the manifestation date. Instead, the date on which the employee became unable to work, due to physical collapse or medical treatment, helps determine the

manifestation date. *Oscar Mayer*, 176 Ill. App. 3d at 611. The appellate court noted that the standard remains flexible: "Just as we reject [the employer's] contention the date of discovery of the condition and its relation to the employment necessarily fixes the date of accident, we reject any interpretation of this opinion which would permit the employee to always establish the date of accident in a repetitive-trauma case by reference to the last date of work." *Oscar Mayer*, 176 Ill. App. 3d at 612. Where the employer concedes that the injury was work-related and that the employee continued to work until the day before surgery, the Commission could reasonably conclude that that day was the date of accident. *Oscar Mayer*, 176 Ill. App. 3d at 611; but see *Casteneda v. Industrial Comm'n*, 231 Ill. App. 3d 734, 738 (1992) (holding that an employee's "last day of exposure to repetitive trauma is not, in and of itself, the day of accident for the purposes of repetitive injury cases").

In *Three "D" Discount Store v. Industrial Comm'n*, 198 Ill. App. 3d 43 (1989), an employee buffed floors for a discount store. After five months, the employee noticed swelling in his hands and shooting pains in his right arm. He visited his doctor, who prescribed pain medication. At that time, he was also being treated by an endocrinologist for a diabetic condition. The employee experienced more severe pain, then numbness and tingling in his fingers and hands. The endocrinologist referred him to a neurologist. On June 27, 1984, the neurologist performed an EMG test and sent a report that the employee had carpal tunnel syndrome to the endocrinologist. The endocrinologist discussed the neurologist's report with the employee and referred him to an orthopedic surgeon. The orthopedic surgeon examined the employee on July 10, 1984, and scheduled surgery for August 1984. The employee then informed his supervisor that he had carpal tunnel syndrome and that it was work-related, and he continued to work until August 10, 1984. He later filed a workers' compensation claim.

The arbitrator rejected this claim, finding that the employee failed to offer any evidence about when his injury occurred. The arbitrator concluded that if there was a work-related injury, it occurred when the employee first noticed swelling and pain, not when he left work in August 1984. The Commission reversed the arbitrator's findings. The Commission decided

that the employee's injury was work-related and that it manifested itself when he left work. The Commission awarded benefits to the employee, and the trial court confirmed this decision.

The appellate court initially reversed the trial court's decision, but on rehearing affirmed. *Three "D" Discount Store*, 198 Ill. App. 3d at 47. The appellate court stated that the evidence established that the endrocrinologist discussed the neurologist's report with the employee, but did not establish that the endocrinologist ever told the employee that his condition was work-related. *Three "D" Discount Store*, 198 Ill. App. 3d at 47-48. The employee learned that his injury was work-related sometime in the month before he informed his supervisor and left work. *Three "D" Discount Store*, 198 Ill. App. 3d at 48. The appellate court concluded that a reasonable person would have been on notice that this condition was work-related and medically disabling on July 10, 1984. *Three "D" Discount Store*, 198 Ill. App. 3d at 48. After reviewing *Oscar Mayer*, the appellate court stated:

> "An employee who continues to work on a regular basis despite his own progressive ill-being should not be punished merely for trying to perform his duties without complaint. On the other hand, it is not this State's policy to encourage disabled workers to silently push themselves to the point of medical collapse before giving the employer notice of an injury." *Three "D" Discount Store*, 198 Ill. App. 3d at 49.

The facts must be closely examined in repetitive-injury cases to ensure a fair result for both the faithful employee and the employer's insurance carrier. *Three "D" Discount Store*, 198 Ill. App. 3d at 49.

RLI argues, and we agree, that fairness and flexibility are the common themes in these cases. Indeed, the rule in *Peoria County* is broad enough to accommodate unique scenarios presented in different cases, and the Commission should weigh many factors in deciding when a repetitive-trauma injury manifests itself. But despite RLI's repeated invocations of flexibility, it asks us to limit the inquiry in this case to only one fact: the unspecified date in September or October 1997 on which Durand first noticed her hand and wrist pain, opined it

could be carpal tunnel syndrome, and guessed it may bear some relation to her work, but declined to mention it to her supervisor for at least three months.

As the appellate court correctly noted in *Oscar Mayer*, "To always require an employee suffering from a repetitive-trauma injury to fix, as the date of accident, the date the employee became aware of the physical condition, presumably through medical consultation, and its clear relationship to the employment is unrealistic and unwarranted." *Oscar Mayer*, 176 Ill. App. 3d at 610. The inquiry is not so narrow. Professor Larson's workers' compensation treatise provides a summary of the case law:

> "The practical problem of fixing a specific date for the accident has generally been handled by saying simply that the date of accident is the date on which disability manifests itself. Thus, in [*Ptak v. General Electric Co.*, 13 N.J. Super. 294, 80 A.2d 337 (1951)], the date of a gradually acquired [back] strain was deemed to be the first moment the pain made it impossible to continue work, and in [*Di Maria v. Curtiss-Wright Corp.*, 23 N.J. Misc. 374, 44 A.2d 688 (1945)], the date of accident for gradual loss of use of the hands was held to be the date on which this development finally prevented claimant from performing his work. However, for certain purposes the date of accident may be identified with the onset of pain occasioning medical attention, although the effect of the pain may have been merely to cause difficulty in working and not complete inability to work." 3 L. Larson, Larson's Workers' Compensation Law §50.05, at 50–11-50–12 (2005).

In short, courts considering various factors have typically set the manifestation date on either the date on which the employee requires medical treatment or the date on which the employee can no longer perform work activities. See *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 138 Ill. App. 3d 880, 887 (1985), *aff'd*, 115 Ill. 2d 524 (1987) (holding that determining the manifestation date is a question of fact and that "the onset of pain and the inability to perform one's job, are among the facts which may be introduced to establish

the date of injury"). A formal diagnosis, of course, is not required. The manifestation date is not the date on which the injury and its causal link to work became plainly apparent to a reasonable physician, but the date on which it became plainly apparent to a reasonable employee. See *General Electric Co. v. Industrial Comm'n*, 190 Ill. App. 3d 847, 857 (1989). However, because repetitive-trauma injuries are progressive, the employee's medical treatment, as well as the severity of the injury and particularly how it affects the employee's performance, are relevant in determining objectively when a reasonable person would have plainly recognized the injury and its relation to work. See *Oscar Mayer*, 176 Ill. App. 3d at 610.

Against this legal background, the question before us is simply whether the date chosen by the Commission was against the manifest weight of the evidence adduced at the arbitration hearing. We believe it was.

According to RLI, Durand admitted that she knew about carpal tunnel syndrome and even suspected she had it in September or October 1997. RLI contends that Durand presented no evidence to show that she changed her mind about her injury or its relation to her work, and concludes that the manifestation date was in 1997. RLI essentially asks us to rely on "expert" medical testimony from a layperson, Durand, and ignore her testimony about her intermittent pain and how it affected her performance.

At the arbitration hearing, Durand testified that she told her supervisor about her hand and wrist pain in September or October of 1997, but she "didn't know at the time what it was," even though she believed it was work-related. Durand reached that "expert opinion" based solely on the pain she was having, not on any doctor's advice. Durand later reiterated that she "wasn't sure" her pain was carpal tunnel syndrome "because it wasn't real constant and real severe" in 1997. She then testified that she "might have heard of" carpal tunnel syndrome and knew people who had had it, and so surmised that she too had developed work-related carpal tunnel syndrome. Durand was never reassigned to other work, and she never sought

medical treatment for her hand and wrist pain until August 15, 2000, when she visited Dr. Escorcia.

Dr. Escorcia noted that Durand reported her pain began 18 months earlier, or a year after she spoke to her supervisor, but the pain was "on and off." Dr. Blume noted that Durand reported her pain began two years before he examined her on September 8, 2000, and progressed when she worked. Dr. Pomerance noted that Durand reported "gradual onset" of hand and wrist pain in mid-2000; she had symptoms approximately 18 months earlier, "but these were not that bothersome to her." Similarly, Dr. Conner noted that Durand reported problems in her arms in mid-2000. Dr. Martin stated Durand's carpal tunnel syndrome could have manifested itself with her hand and wrist pain in 1997, but gave no indication whether he reached that conclusion using the *Peoria County* standard.

If Durand would have filed a claim in 1997, she certainly would have had difficulty proving her injury. Her description and understanding of the hand and wrist pain was sketchy and equivocal. At that time, it was not so constant or severe that it warranted medical treatment or reassignment to different work. As Justice Holdridge suggested in his dissent, "the circumstances signal periodic discomfort leading to doubt about the existence of a distinct injury." 358 Ill. App. 3d at 246 (Holdridge, J., dissenting, joined by Donovan, J.). The record strongly suggests that this doubt lingered until 2000, when Durand's pain finally necessitated medical treatment. A reasonable person would not have known of this injury and its putative relationship to computer keyboard work before that time, and it was against the manifest weight of the evidence to conclude otherwise. Durand's claim was timely. We decline to penalize an employee who diligently worked through progressive pain until it affected her ability to work and required medical treatment.

However, we must remand this cause to the Industrial Commission. RLI, relying on testimony from Dr. Pomerance, disputed whether Durand's work activities caused her injuries. The Commission decided this case solely on the limitations period issue, and did not weigh the evidence on causation. We

˘18˘

decline to usurp this function of the Commission, based upon the paper record before us.

## CONCLUSION

For the reasons that we have stated, we reverse the judgments of the appellate and circuit courts, set aside the decision of the Industrial Commission, and remand this matter to the Commission for further proceedings.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*Commission decision set aside;*
*cause remanded.*

JUSTICE BURKE took no part in the consideration or decision of this case.

JUSTICE GARMAN, dissenting:

Claimant's testimony before the arbitrator more than adequately supports the Commission's conclusion that claimant's carpal tunnel syndrome and its relationship to her employment would have been "plainly apparent to a reasonable person" (*Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524, 531 (1987)) in September or October of 1997. In reversing the Industrial Commission's decision that the claim at issue was barred by the Workers' Compensation Act's three-year statute of limitations (820 ILCS 305/6(d) (West 2004)), the majority misapplies the deferential manifest weight of the evidence standard of review and obliquely modifies the test set forth in *Peoria County* for determining the manifestation date of a claimant's injury. Consequently, I dissent.

The evidence presented to the Commission regarding the date claimant's injury manifested itself included her testimony before the arbitrator (slip op. at 4-5) and the medical notes and deposition testimony of the five physicians who examined her (slip op. at 2-4). Claimant's testimony contains four admissions

that she was aware of her injury and its relationship to her employment in September or October of 1997, at which time she reported her hand and wrist problems to her supervisor. The medical evidence reveals various conflicting estimates by claimant of the time period when she first noticed the onset of her hand and wrist pain.

The majority acknowledges that the Commission's determination of the date claimant's injury manifested itself must be given deference on review (slip op. at 8-9) and states that the Commission applied the correct legal standard in making that determination (slip op. at 10). Accordingly, the Commission's determination that claimant's injury manifested itself more than three years before the date she filed her application for benefits should be upheld.

As the majority notes, a reviewing court will not reverse a factual determination of the Commission unless it is against the manifest weight of the evidence. *Shockley v. Industrial Comm'n*, 75 Ill. 2d 189, 193 (1979). To that end, a reviewing court must not reweigh the evidence, or reject reasonable inferences drawn from it by the Commission, simply because other reasonable inferences could have been drawn. *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59, 65 (1982). Setting the date of a claimant's injury is a factual determination for the Commission (*Palos Electric Co. v. Industrial Comm'n*, 314 Ill. App. 3d 920, 930 (2000)), and that determination is governed by the standard this court set forth in *Peoria County*: the date of injury in a case involving repetitive trauma is the date when the injury "manifests itself," meaning "the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person" (*Peoria County*, 115 Ill. 2d at 531).

In this case, it was reasonable for the Commission to conclude, based on the evidence described above, that the fact of claimant's injury and its relationship to her employment would have been plainly apparent to a reasonable person in September or October of 1997. To begin with, the evidence was sufficient for the Commission to reasonably conclude that the fact of claimant's injury and its relationship to her employment were *actually apparent to her* in September or

October of 1997. Claimant admitted no less than four times in her testimony before the arbitrator that she was aware of her injury and its relationship to her employment at that time. In evaluating the evidence before it, it was unquestionably within the province of the Commission to give weight to that uncontradicted testimony and discount the conflicting accounts of the onset of claimant's pain that she gave to her physicians.

To the extent the majority questions the reasonableness of claimant's actual belief in September or October of 1997 that she was injured and the injury was related to her employment, I would again emphasize this court's limited role as a reviewing tribunal in this case. See *International Harvester*, 93 Ill. 2d at 65. Claimant testified that she experienced no hand or wrist problems before working at RLI Insurance Company, that she had no hobbies involving the intensive use of her hands, that she did not use a computer outside of work, and that she was generally aware of the nature of carpal tunnel syndrome at the time she reported her hand and wrist problems to her supervisor. Based on this testimony, the Commission could reasonably have inferred that claimant's belief in September or October of 1997 that her hands and wrists were injured and the injury was related to her employment was a reasonable one. Indeed, even Dr. Robert Martin, the physician who examined claimant at the request of her attorney, testified at his evidentiary deposition that if she experienced symptoms such as "numbness, tingling or pain and combinations thereof" in 1997, those symptoms "certainly could have been" a manifestation of carpal tunnel syndrome.

The majority attempts in part to justify its reevaluation of the evidence by relying on *General Electric Co. v. Industrial Comm'n*, 190 Ill. App. 3d 847, 857 (1989), for the proposition that "[t]he manifestation date is not the date on which the injury and its causal link to work became plainly apparent to a reasonable physician, but the date on which it became plainly apparent to a reasonable employee." Slip op. at 15; see also slip op. at 16 ("RLI essentially asks us to rely on 'expert' medical testimony from a layperson, Durand, and ignore her testimony about her intermittent pain and how it affected her performance. *** Durand reached that 'expert opinion' based solely on the pain she was having, not on any doctor's

advice"). Notably, in *General Electric*, the appellate court determined that the evidence supported the conclusion that the claimant's injury and its connection to her employment would have been plainly apparent to a reasonable person on the date the claimant noticed a "sharp pain" in her shoulder while working, *not* on the subsequent date when a physician opined that the claimant's condition and her work were causally related. *General Electric*, 190 Ill. App. 3d at 857. More importantly, while I agree as a general matter that it would be unfair to expect employees to diagnose their injuries and discern the relationship between their injuries and their employment with the expertise of trained physicians, this proposition is inapposite here. Based on the evidence presented to the Commission, I fail to see why it could not reasonably have concluded that a reasonable person in claimant's circumstances would have been aware she was injured and that the injury was employment related. The only way to maintain this position is to do as the majority has done: secondguess the Commission's interpretation of claimant's testimony and suggest it was unreasonable for her to be aware of her condition until she was formally diagnosed.

The majority cites no authority for the proposition that the manifestation date of a claimant's injury must be determined on the basis of a formal medical evaluation. In fact, the majority emphasizes that "fairness and flexibility are the common themes" of cases that have applied the *Peoria County* standard and acknowledges that "the Commission should weigh many factors in deciding when a repetitive-trauma injury manifests itself." Slip op. at 14. I have no quarrel with permitting the Commission to weigh numerous factors in determining when a repetitive-trauma injury manifests itself. It strikes me as somewhat ironic, however, that the majority's resolution of this case actually appears to narrow the permissible scope of the Commission's inquiry in setting a manifestation date. The majority declares that claimant's injury did not manifest itself until sometime in 2000, when claimant's pain necessitated medical treatment. Slip op. at 17. Thus, the *de facto* rule established by this case seems to be that, regardless of a claimant's actual and reasonable awareness of an injury's manifestation, corroborative medical treatment is necessary

before it can be said that a reasonable person would plainly recognize the injury and its causal relationship to his or her employment. This rule creates a puzzling inconsistency, because while the majority claims to maintain a totality of the circumstances approach to determining a repetitive-trauma injury's manifestation date, it seems to have made the medical diagnosis of such an injury the determinative factor in that inquiry.

Claimant is to be commended for continuing to work after the onset of her symptoms. As the majority notes, claimant "diligently worked through progressive pain until it affected her ability to work and required medical treatment." Slip op. at 17. Claimant's persistence, however, should not excuse her from her obligation to file a timely application for benefits. I fear the majority has allowed this equitable consideration to become the driving force behind its decision to reverse the judgment of the Commission, and that it has done so at the expense of obscuring the heretofore straightforward analysis used in reviewing the Commission's determination of a manifestation date. For the reasons set forth above, I would affirm the judgment of the appellate court, which upheld the circuit court's confirmation of the Commission's decision to deny claimant's application for benefits.

JUSTICE KARMEIER joins in this dissent.