2020 IL App (4th) 200091WC-U
Nos. 4-20-0091WC, 4-19-0095WC cons.
Order filed

FILED
October 22, 2020
Carla Bender
4th District Appellate
Court, IL

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| RYAN KMIECIAK,<br><br>    Appellant,<br><br>v.<br><br>THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Reynold Consumer Products, Appellee). | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from<br>Circuit Court of<br>Morgan County<br>No. 18MR61<br><br><br>Honorable<br>Christopher E. Reif,<br>Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirmed the circuit court's judgment confirming the Workers' Compensation Commission's decisions (1) vacating an award of temporary total disability for injuries sustained on March 1, 2014, because claimant's resignation from employment constituted a refusal to work within medical restrictions, (2) decreasing the award of permanent partial disability because the evidence did not demonstrate a loss of occupation from injuries sustained on March 1, 2014, and (3) vacating the award of permanent partial disability because no evidence demonstrated claimant suffered such disability from injuries sustained on February 12, 2013.

¶ 2    On March 24, 2014, claimant, Ryan Kmieciak, signed an application for adjustment

of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2012)), seeking benefits from appellee, his employer, Reynold's Consumer Products (Reynold's). Claimant, a 36-year-old married man with one dependent child, alleged he sustained a work-related injury on February 12, 2013, when he struck his hand on a pole injuring his left hand, thumb, and wrist. This claim was filed on April 1, 2014, and assigned case No. 14-WC-10769.

¶ 3        Also, on March 24, 2014, claimant filed a second application for adjustment of claim pursuant to the Act, seeking benefits from Reynold's. Claimant alleged he sustained another work-related injury on March 1, 2014, when he was pulling a 600-pound cart and was forced to stop the cart from its forward motion, using both hands. His left hand slipped off the handle. His left thumb bent back toward his wrist. This claim was also filed on April 1, 2014, and assigned case No. 14-WC-10935. Claimant reported on the applications both injuries were diagnosed as de Quervain's tenosynovitis.

¶ 4        Following a hearing, where both applications were considered, the arbitrator found claimant had failed to prove his current condition of ill-being was causally related to his February 12, 2013, accident. However, the arbitrator awarded him (1) permanent partial disability (PPD) benefits of $327 per week for 10.25 weeks due to the 5% loss of the use of his left hand, (2) compensation from February 12, 2013, through November 18, 2016, and (3) unpaid medical bills in the amount of $318.45.

¶ 5        The arbitrator further found claimant had sufficiently proved his current condition of ill-being *was* causally related to his March 1, 2014, accident. The arbitrator awarded him (1) temporary total disability (TTD) benefits of $363.33 per week from August 13, 2014, through October 14, 2015, a period of 62 and 1/7 weeks, (2) PPD benefits of $327 per week for 150 weeks due to a 30% loss of his whole person, (3) compensation from March 1, 2014, through November

18, 2014, and (4) unpaid medical bills in the amount of $22,784.41.

¶ 6        On review, the Illinois Workers' Compensation Commission (Commission), with one commissioner dissenting in each case, filed two separate decisions, which modified the arbitrator's decisions by (1) vacating the award of PPD in relation to the February 12, 2013, accident, (2) reversing the award of TTD in relation to the March 1, 2014, accident, and (3) modifying the extent of claimant's injury from 30% loss of whole person to 30% loss of use of his left hand in relation to the March 1, 2014, accident.

¶ 7        Claimant sought judicial review of the Commission's decisions before the circuit court of Morgan County. The court confirmed the Commission's decisions in full. We affirm the circuit court.

¶ 8                                    I. BACKGROUND

¶ 9        On November 18, 2016, the arbitrator heard evidence on claimant's petitions. The issues in this appeal involve the award and denial of benefits to claimant for injuries to his left hand. Accordingly, the following recitation of facts taken from the evidence presented at the arbitration hearing on November 18, 2016, is limited to facts relevant to the Commission's orders modifying the arbitrator's decisions.

¶ 10        Claimant testified he had been employed at Reynold's since February 2013, as a machine operator, though he had worked at Reynold's since April 2012 as a forklift operator through a temporary agency. On February 12, 2013, he was "filling a machine with chips" when he thought he heard someone call his name. He turned around and hit the inside of his left wrist on the corner of a pole. He said he had never injured his left hand or ever had any problems with it before. He said at that time, it felt like a "stoved toe," or a stubbed toe. He continued to work as scheduled. The pain progressed over the next few days and he began to lose strength in his hand.

He first sought medical treatment at Passavant Area Hospital on March 2, 2013. The doctor placed his thumb in a spica splint and ordered him off work for two days. He, within days, tendered the hospital record to his supervisor. Reynold's referred claimant to Midwest Occupational Health Associates, where claimant was treated by Dr. Robert Gordon, who prescribed ibuprofen and Tylenol and advised claimant to return to work without restrictions. He returned for a follow-up visit to Dr. Gordon on March 8, 2013, with throbbing pain, tenderness, and some weakness. Dr. Gordon prescribed prednisone but did not place him on any restrictions. Claimant returned to Dr. Gordon on March 20, 2013, and April 12, 2013, with some improvement. Dr. Gordon diagnosed claimant with de Quervain's tenosynovitis and administered an injection in claimant's thumb. By June 7, 2013, claimant's subjective complaints were worse, so Dr. Gordon ordered a magnetic resonance image (MRI) scan which occurred on July 18, 2013, at Memorial Medical Center. The MRI showed no abnormalities related to his injury. On July 24, 2013, Dr. Gordon reviewed the results of the MRI with claimant and declined any further treatment. Dr. Gordon discharged claimant from care on July 31, 2013.

¶ 11 According to claimant, his symptoms did not subside. He continued to have weakness and limited mobility in his left wrist with occasional sharp stabbing pains or a tingling sensation, but he continued as a full-time machine operator for Reynold's.

¶ 12 On March 1, 2014, claimant had finished stacking a pallet of product (cases of packaged trash bags) and was pulling the product (approximately 600 pounds) with a manual pallet jack to the aisle for the forklift operator. Claimant used his right hand to pull the pallet jack behind him. Another employee had pushed their pallet of product into claimant's path without noticing claimant's load. Claimant turned to place both hands on the handle to stop the pallet from moving forward. His left hand slipped off the handle, catching his thumb and bending it back toward his

- 4 -

wrist. He said he immediately "felt like a pop in [his] hand and [his] wrist." He told his supervisor but continued his shift. His left hand and wrist were swollen. He experienced the "same symptoms" as his first injury "but more pain, more *** restrictions on [his] range of motion to the point where [he] was unable to move [his] thumb for quite a long time."

¶ 13 The day after the injury, claimant tried to perform his regular job duties, but he found his left hand and wrist would throb. He said he felt "severe pain" and he had no strength in his hand. He advised his supervisor that he was unable to perform his duties. His supervisor assigned him the position of a "reliever," in which he would perform the same duties but only for someone else who was on a break. Claimant said he "was still unable to do that," so he was moved to the "rework area" where he would open boxes and remove the product from inside.

¶ 14 Dr. Gordon had ordered x-rays, which were negative, and another MRI, which was performed on March 18, 2014. Claimant admitted the results of the MRI were unremarkable. Dr. Gordon did not place any restrictions on claimant and treated him with prednisone. On April 14, 2014, claimant saw Dr. Gordon, who suggested claimant see an orthopedic doctor due to his continued complaints of pain. Dr. Gordon noted he could not explain claimant's reported symptomatology.

¶ 15 Also, on March 18, 2014, claimant said the unit manager called him and informed him he was no longer employed at Reynold's. The manager said he was "pushing [claimant's] two-week notice up." Claimant denied he gave a two-week notice, though he did admit he had "conversations with someone at Reynold's" about his desire or consideration of moving out of state, but he had not given an actual date or a name of the person with whom he spoke.

¶ 16 Claimant began treating with Dr. Mark Greatting on April 23, 2014. Claimant described his March 1, 2014, accident, without mentioning his February 12, 2013, accident. The

doctor gave claimant his second injection in his wrist, which, according to claimant, did not alleviate any symptoms. Dr. Greatting diagnosed claimant with de Quervain's tenosynovitis and referred claimant to neurologist Dr. Koteswara Narla for a bone scan. Dr. Greatting suspected claimant suffered from complex regional pain syndrome. On September 29, 2014, Dr. Narla prescribed Neurontin and amitriptyline, believing that claimant may have suffered a soft tissue ligamentous injury. The bone scan was negative for regional pain syndrome.

¶ 17        In August 2014, Dr. James Williams performed an independent medical examination (IME) at Reynold's request. Dr. Williams noted claimant informed him he was no longer employed at Reynold's after having given his two-week notice in February 2014. Dr. Williams opined that the work accident caused a complex regional pain syndrome. He noted that some of claimant's responses to examination were exaggerated with a demonstrated inconsistency in grip-strength testing. He further noted that claimant was not at maximum medical improvement (MMI) but felt claimant could work with restrictions.

¶ 18        Claimant returned to Dr. Greatting on December 4, 2014, at which time the doctor suggested surgery or a de Quervain release. Claimant had surgery on February 6, 2015, and Dr. Greatting released claimant on a temporary light-duty work restriction. On March 19, 2015, the doctor suggested claimant begin physical therapy at Passavant. Claimant noticed some improvement in his range of mobility but not any improvement in his strength. Claimant's pain had decreased after surgery to a 5 or 6 on a 10-point scale from his usual 8 or 9. The pain had also changed from a tingling sensation to a dull ache. On June 3, 2015, Dr. Greatting recommended claimant undergo a functional capacity evaluation (FCE), which was performed on August 5, 2015.

¶ 19        Claimant advised the therapist at the FCE that his job required heavy physical demand, such as the frequent lifting of 45 pounds. The therapist noted several instances

questioning claimant's effort and consistency during the evaluation. He noted that claimant's subjective complaints of pain were inconsistent with displayed function. And claimant's increased heart rate indicated less than full effort. The therapist opined that claimant could perform activity on a full-time basis with lifting 14 pounds occasional and 8 pounds frequent, pushing 94.5 pounds and pulling 129.5 pounds occasionally. On October 14, 2015, Dr. Greatting issued permanent lifting restrictions based upon the FCE and released claimant at MMI.

¶ 20 Claimant said he moved to Pennsylvania in April 2016 and he remains unemployed. He said he continues to have a reduced range of motion, weakness, and pain, which fluctuates day-to-day with the weather or activity. He said the injury "has really changed [him] a lot because there [are] a lot of things that [he] can no longer do." He said he was a volunteer firefighter and worked as an emergency medical services (EMS) technician for 17 years. He cannot work in EMS because he cannot lift anyone or carry a stretcher. His family must assist him with cooking, opening jars, and cutting up his food.

¶ 21 Scott Honnen testified on behalf of Reynold's. Honnen said he had worked for Reynold's for 27 years. For the last 10 years, he has worked as a unit manager on the manufacturing side of the business. He said Reynold's has a light-duty program to assist injured employees find positions within the company that comply with any medical restrictions. This program was in place in 2013 and 2014. When asked his understanding of why claimant left his employment, Honnen responded: "He gave his resignation" because he "was moving out of state."

¶ 22 On cross-examination, Honnan said he was not sure whether claimant received any kind of notice that claimant's employment had ended; nor had Honnan seen a resignation letter from claimant, though many times employees do not submit one.

¶ 23 On January 16, 2017, after considering the evidence presented, the arbitrator filed

two written decisions. In the first decision, in case No. 14-WC-10769, referring to the accident date of February 12, 2013, the arbitrator concluded claimant's current condition of ill-being was not causally related to the accident, as there had been no evidence presented connecting the two and claimant's accident on March 1, 2014, broke any chain of causation. However, the arbitrator found claimant had proved a causal connection through July 31, 2013, the day claimant reached MMI and was released from Dr. Gordon's care. Claimant was awarded $318.45 as reasonable, necessary, and causally related medical bills. The arbitrator denied TTD benefits but found claimant was permanently partially disabled to the extent of 5% loss of use of his left hand.

¶ 24        In the second decision, in case No. 14-WC-10935, referring to the accident date of March 1, 2014, the arbitrator concluded claimant's current condition of ill-being *was* causally related to the accident. The arbitrator awarded TTD benefits in the amount of $363.33 per week for 62 and 1/7 weeks for the time period of August 13, 2014 (date of IME), through October 14, 2015 (the date of MMI), and PPD benefits in the amount of $327 per week for 150 weeks because the injury caused 30% loss of the whole person. Claimant was awarded $22,784.41 as reasonable, necessary, and causally related medical bills.

¶ 25        On June 12, 2018, the Commission addressed each case separately. In case No. 14-WC-10769, which was assigned case No. 18-IWCC-0370, the Commission modified the arbitrator's decision in part, and otherwise affirmed and adopted it with one commissioner filing a dissent. The Commission found the arbitrator's award of PPD was in error, noting "[g]iven the limited amount of time between the date [claimant] reached MMI [(July 31, 2013)] and the March 1, 2014, injury as well as the severity of the March 2014 injury, the Commission finds [claimant] did not sustain any permanent partial disability due to the February 2013 work accident." The Commission vacated the arbitrator's award of 5% loss of use of the left hand. The Commission

otherwise affirmed and adopted the decision.

¶ 26    In case No. 14-WC-10935, which was assigned case No. 18-IWCC-0371, the Commission also modified the arbitrator's decision in part, and otherwise affirmed and adopted it with the same commissioner again filing a dissent. The Commission found the arbitrator's award of TTD was in error because claimant had failed to prove he was unable to work due to an incapacitating injury when Reynold's had a light-duty program in place. Further, the Commission found claimant sustained a 30% loss of use of the left hand, not the whole person. The Commission reduced claimant's award of PPD benefits from 150 weeks to 61.5 weeks. The Commission otherwise affirmed and adopted the decision.

¶ 27    Claimant sought timely review of both decisions and filed a complaint for review in the Morgan County Circuit Court. The complaint, which combined both cases, was assigned case No. 18-MR-61.

¶ 28    On February 8, 2019, the circuit court affirmed the Commission's decisions in their entirety. Claimant appealed. The appeal was docketed in this court as case No. 4-19-0095WC. While the record was being prepared, claimant realized the circuit court did not have access to the entire record of the proceedings before the Commission. Claimant sought a stay of the appeal and a remand to the circuit court for further proceedings. This court granted his requested relief.

¶ 29    On January 16, 2020, the circuit court of Morgan County again confirmed the Commission's decisions in their entirety. Claimant appealed. The appeal was docketed in this court as case No. 4-20-0091WC. In April 2020, upon claimant's motion, this court consolidated the appeals, designating case No. 4-20-0091WC as the lead case.

¶ 30    This consolidated appeal followed.

¶ 31                                II. ANALYSIS

¶ 32        On appeal, claimant argues the Commission's decision to (1) vacate the TTD award in case No. 14-WC-10935 (case No. 18-IWCC-0371) was contrary to law and against the manifest weight of the evidence, (2) decrease the PPD award in case No. 14-WC-10935 (case No. 18-IWCC-0371) was against the manifest weight of the evidence, and (3) vacate the PPD award in case No. 14-WC-10769 (18-IWCC-0370) was against the manifest weight of the evidence.

¶ 33                    A. TTD Award in Case No. 18-IWCC-0371

¶ 34        An employee is temporarily totally incapacitated from the time an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of injury will permit. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990); *Shafer v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 45. Claimant must prove that not only did he not work but that he was unable to work. *Shafer*, 2011 IL App (4th) 100505WC, ¶ 45. A TTD award is proper when the claimant cannot perform any services except those for which no reasonable stable labor market exists. *Archer Daniels Midland*, 138 Ill. 2d at 118. Once an injured employee's physical condition stabilizes, he is no longer eligible for TTD benefits, although he may be entitled to permanent partial total disability compensation under section 8(d) of the Act (820 ILCS 305/8(d) (West 2012)) or permanent total disability compensation under section 8(f) of the Act (*id.* § 8(f)). *Archer Daniels Midland*, 138 Ill. 2d at 118. "The fundamental purpose of the Act is to provide injured workers with financial protection until they can return to the work force." *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 146 (2010).

¶ 35        Whether a claimant is entitled to TTD benefits and for how long are questions of fact to be determined by the Commission, and a reviewing court will not disturb the Commission's determination of these issues unless they are contrary to the manifest weight of the evidence.

*Archer Daniels Midland*, 138 Ill. 2d at 119. A factual finding is contrary to the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64 (2006). The test is whether there is sufficient factual evidence in the record to support the Commission's determination, not whether this court, or any other tribunal, might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002). The determination of witness credibility and the weight to be accorded the evidence are matters within the province of the Commission. *Id.*

¶ 36    Applying these standards, we cannot say that the Commission's decision to deny TTD benefits due to claimant's resignation from his position at Reynold's was against the manifest weight of the evidence. It is undisputed that, at the time of his separation from Reynold's (March 19, 2014), the claimant had not reached MMI and was still undergoing treatment for his March 1, 2014, injury. Claimant argues the evidence does not support the Commission's finding that he resigned from his employment. Instead, he claims, the evidence demonstrated he was involuntarily terminated.

¶ 37    Our review of the record supports the Commission's findings. The evidence showed that, in April 2014, when claimant sought further treatment from Dr. Gordon, the doctor did not restrict claimant's work activity. He was advised to use over-the-counter pain relief but was "cleared to perform all job functions." Further, during the August 2014 IME, Dr. Williams noted claimant had reportedly not worked since March 11, 2014, and was currently unemployed. Claimant concedes that Dr. Williams' IME report states that claimant told the doctor he had given his two-week notice in February 2014.

¶ 38    Claimant admitted he had conversations with someone at Reynold's about moving out of state for financial reasons. He could not recall the specific dates of the conversation, but he

acknowledged the conversation would have occurred in 2014. Claimant denied anyone from Reynold's ever contacted him offering a light-duty assignment. He did recall receiving a telephone call from the unit manager, Scott, on March 18, 2014. Claimant could not "for the life of [him]" recall Scott's last name. Scott told him that " 'as of that time [he] no longer worked for Reynolds.' " Claimant testified: "He said that I had given my two week notice and he was pushing my two weeks notice up." However, claimant denied ever giving a two-week notice. He said he "specified that [he] was thinking about leaving but [had] never given an actual date." He admitted he had never asked Reynold's for assistance in finding a job.

¶ 39        Reynold's unit manager, Scott Honnen, testified Reynold's has a light-duty program available to help injured employees remain employed within medical restrictions. He testified it was his understanding that claimant resigned because he planned to move out of Illinois. He said Reynold's would have placed claimant in a work assignment that complied with any physical restrictions.

¶ 40        Accordingly, there was ample evidence to support the Commission's finding that, although claimant had not reached MMI, his separation from employment on or about March 19, 2014, constituted a refusal to work within any stated medical restrictions. Claimant admitted Reynold's had assigned him other duties immediately after his injury on March 1, 2014, to accommodate his complaints of pain and weakness in his hand. Thus, claimant's testimony that he was unaware of Reynold's light-duty program was disingenuous.

¶ 41        When considering whether an injured employee is entitled to TTD benefits, the dispositive test is generally whether the worker's condition has stabilized, and he has reached MMI. *Interstate Scaffolding*, 236 Ill. 2d at 146. However, our supreme court noted TTD benefits may be denied without regard to a claimant's status of MMI where the claimant has refused work

that falls within the physical restrictions prescribed by his doctor. *Id.* The Commission's decision that claimant "effectively refused work" by voluntarily resigning from his position at Reynold's and/or by not taking advantage of a light-duty position available at Reynold's, which thereby precluded his entitlement to TTD benefits, was supported by evidence in the record. That is, given the evidence presented at the hearing, the Commission's decision to deny claimant's claim for TTD benefits was not against the manifest weight of the evidence, as the opposite conclusion was not "clearly apparent." *Holocker v. Illinois Workers' Compensation Comm'n*, 2017 IL App (3d) 160363WC, ¶ 38.

¶ 42                                B. PPD Award in Case No. 18-IWCC-0371

¶ 43        Claimant argues that, under the manifest weight of the evidence standard, the Commission failed to give proper weight to certain portions of claimant's FCE report, which, in his opinion, indicated he was unable to perform his job. He claims the Commission erred by reducing the PPD award of 30% loss of the whole person to a 30% loss of his left hand.

¶ 44        The nature and extent of an injured employee's disability is a question of fact to be resolved by the Commission, as is the issue of whether the employee is incapacitated from pursuing his usual and customary employment as the result of an employment related injury. *Sysco Food Service of Chicago v. Illinois Workers' Compensation Comm'n*, 2017 IL App (1st) 170435WC, ¶ 50. Because of the Commission's expertise, its findings as to the nature and extent of disability should be given substantial deference. *Continental Tire of America, LLC v. Illinois Workers' Compensation Comm'n*, 2015 IL App (5th) 140445WC, ¶ 20. The Commission's findings will not be set aside unless they are contrary to the manifest weight of the evidence. *Id.* As stated, a decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 45 In determining the level of a claimant's permanent partial disability, section 8.1b(b) of the Act (820 ILCS 305/8.1b(b) (West 2012)) directs the Commission to consider: "(i) the reported level of impairment pursuant to subsection (a); (ii) the occupation of the injured employee; (iii) the age of the employee at the time of the injury; (iv) the employee's future earning capacity; and (v) evidence of disability corroborated by the treating medical records."

¶ 46 Although the Commission considered each factor, it placed the greatest weight on the last factor, finding the treating records did not support the extent of the disability claimed. Dr. Greatting had performed surgery on claimant's left hand after claimant was diagnosed with de Quervain's tenosynovitis. Despite the surgical release, claimant complained of chronic residual symptoms from the March 1, 2014, work injury. The Commission relied on various parts of the record, including the FCE, where claimant's providers noted inconsistencies between subjective complaints and objective results and an overall lack of effort on claimant's part. Like the arbitrator, the Commission questioned claimant's credibility. The therapist performing the FCE found claimant was putting forth questionable effort during the examination, describing it as "self-limiting." The therapist also opined that claimant's subjective complaints of pain were inconsistent with his displayed function. Dr. Williams also questioned claimant's effort during his physical examination of claimant's grip strength, noting inconsistencies in the results. Dr. Gordon noted claimant was unable to make a fist when requested, but he could when "observed." Based on claimant's reported lack of effort and noted inconsistencies in his medical records, the Commission found the results of the FCE did not accurately reflect claimant's true work capabilities.

¶ 47 On this record, the Commission found claimant had not met his burden of proving he suffered a loss of occupation due to his March 1, 2014, work injury. Claimant's physician did not place any restrictions on claimant's return to work other than suggesting he proceed with

caution. As such, the Commission found claimant was not entitled to a loss-of-trade award pursuant to section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 2012)). Accordingly, the Commission modified the arbitrator's finding and found claimant suffered a 30% loss of use of the left hand, not the whole body.

¶ 48 The weight to be given to the treating providers' opinions, as well as the conclusions and inferences to be drawn from the claimant's testimony and medical evidence are matters for the Commission to determine. Nothing in this record compels us to second-guess the Commission's factual findings with respect to the nature and extent of the claimant's disability.

¶ 49 C. PPD Award in Case No. 18-IWCC-0370

¶ 50 Claimant also contends the Commission erred in vacating the PPD award in relation to the February 12, 2013, accident. The arbitrator found, after evaluating the relevant factors of section 8.1b(b) of the Act, that claimant suffered a 5% loss of use of his left hand. Claimant sought treatment for the injury from Dr. Gordon, who diagnosed him with de Quervain's tenosynovitis. A July 2013 MRI showed no abnormalities related to the injury. Dr. Gordon found claimant had reached MMI. Claimant continued to work full duty without restrictions until his second accident on March 1, 2014. The Commission found that this second accident, which occurred eight months after claimant reached MMI from the first accident, was "much more significant" than the first accident. The Commission held: "Given the limited amount of time between the date [claimant] reached MMI and the March 1, 2014, injury as well as the severity of the March 2014 injury, the Commission finds [claimant] did not sustain any permanent partial disability due to the February 2013 work accident." Citing *Baumgardner v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 274, 280 (2011), the Commission vacated the arbitrator's award of PPD based on a 5% loss of use of his left hand.

¶ 51 Indeed, *Baumgardner* supports the Commission's decision. There the court stated: "From a procedural and practical standpoint, where a claimant has sustained two separate and distinct injuries to the same body part and the claims are consolidated for hearing and decision, it is proper for the Commission to consider all of the evidence presented to determine the nature and extent of his permanent disability as of the date of the hearing." *Id.* at 279-80. Here, the Commission considered the totality of the evidence, including the timing of the separate accidents, the extent of injury to the same body part, and claimant's ability to work without restrictions after the first accident before determining that claimant had not suffered any permanent disability due to the first accident. The Commission's decision is supported by the manifest weight of the evidence, as it is not clearly apparent that an opposite conclusion should have been reached. See *Durand*, 224 Ill. 2d at 64.

¶ 52                                                    III. CONCLUSION

¶ 53 For the reasons stated, we affirm the circuit court's judgment, which confirmed the Commission's decision.

¶ 54 Affirmed.